[S. F. No. 7134. In Bank.—August 4, 1915.]

WESTERN INDEMNITY COMPANY (a Corporation), Petitioner, v. A. J. PILLSBURY et al., as Members of and Constituting THE INDUSTRIAL ACCIDENT COMMISSION OF THE STATE OF CALIFORNIA, Respondents.

WORKMEN'S COMPENSATION ACT OF 1913—CONSTITUTIONAL LAW—LIABILITY OF EMPLOYER IRRESPECTIVE OF NEGLIGENCE—POLICE POWER. The Workmen's Compensation, Insurance and Safety Act of 1913 (Stats. 1913, p. 279), imposing upon employers as defined therein without regard to their negligence or the lack of negligence of their

employees, a liability for the compensation provided therein, in lieu of any other liability whatsoever, for any personal injuries sustained by their employees by accident arising out of and in the course of the employment, and making the compensation provisions of the act compulsory on all employers and employees coming within its terms, is not violative of the clauses of the fourteenth amendment of the federal constitution guaranteeing "due process of law," and "the equal protection of the laws," and is a valid legislative exercise of the police power. (Per. Sloss, J., Angellotti, C. J., and Lawlor, J., concurring.) Shaw, J., concurred in holding the act constitutional on the ground that the system of compensation insurance provided therein rendered the act reasonable, and, solely on that ground, Lorigan, J., and Melvin, J., concurred in affirming the award. On rehearing, Shaw, J., doubted the validity of the act so far as it declares that an employer who is himself without fault may be compelled to compensate his employee for an accidental personal injury which such employee has inflicted upon himself solely by his own negligence. Henshaw, J., dissented.

ID.—EMPLOYER NOT IN FAULT—FREEDOM FROM LIABILITY NOT A PROPERTY RIGHT.—Freedom from liability on the part of an employer who has been guilty of no fault is not a fundamental property right of which he cannot be deprived by mere legislative enactment.

ID.—CHANGES IN LAW GOVERNING RELATION OF MASTER AND SERVANT—LEGISLATURE MAY MAKE.—A law which disturbs no vested right of property, which is not retroactive in its operation upon the conduct of persons, but which, looking to the future, merely changes the existing rules governing the liability of masters for injuries caused by accidents occurring to their servants while in the service, does not come within the scope of the fourteenth amendment. It is simply an exercise by the state of its governmental power to pass laws regulating the ordinary private rights of persons and property. The Workmen's Compensation Act of 1913 is of this character.

ID.—LAW NOT LIMITED TO EXTRA-HAZARDOUS INDUSTRIES.—The circumstance that such act does not limit the scheme of compensation to specially enumerated industries, selected as and declared to be extra-hazardous in character, is immaterial in determining its constitutionality within the purview of the fourteenth amendment.

ID.—DIRECT LIABILITY OF EMPLOYER TO EMPLOYEE.—No distinction, so far as constitutional objections are concerned, can be based upon the fact that such act imposes upon the employer a liability to compensate his employees for injuries actually received in the particular employment, while under other statutes all employers are required to contribute sums, proportioned to their pay-roll and graduated according to the nature of the industry, into a fund out of which all claims for compensation are to be paid.

ID.—COMPENSATION INSURANCE—PROVISIONS FOR PREVENT ACT FROM BEING UNREASONABLE.—The system of compensation insurance provided by the act, whereby the employer, at a reasonable burden to himself by way of premiums paid to the state or to private insurers, is empowered to protect himself against personal liability by taking out the insurance provided for, removes any constitutional objection to the act, under the provisions of the fourteenth amendment, based upon the theory that the imposition upon the employer of direct liability for injuries is unreasonable and arbitrary.

ID.—EXCLUSION OF ENUMERATED OCCUPATIONS—ACT NOT VIOLATIVE OF STATE CONSTITUTION—SPECIAL LEGISLATION.—The exclusion from the operation of the act of casual employees and employees engaged in farm, dairy, agricultural, viticultural, or horticultural labor, in stock or poultry raising, or in household domestic service, is not violative of section 21 of article XX of the state constitution, authorizing the legislature to create a liability on the part of *all* employers to compensate their employees for injuries incurred by them in the course of their employment, nor does it render the act void as special legislation.

ID.—LEGISLATIVE CLASSIFICATION OF OCCUPATIONS.—The legislative classifications of those persons coming within and those exempt from the operation of the act must be deemed to be founded in reason and to be based on rational grounds of differentiation, and do not evidence an arbitrary discrimination.

ID.—INDUSTRIAL ACCIDENT COMMISSION—REVIEW OF FINDINGS—JURISDICTIONAL FACTS.—*Great Western Power Co.* v. *Pillsbury, ante,* p. 180, followed and approved, as to the extent to which the supreme court may, under a writ of *certiorari,* inquire into the sufficiency of the evidence to sustain findings of the jurisdictional facts underlying the power of the Industrial Accident Commission to award compensation under the Workmen's Compensation Act of 1913.

ID.—JURISDICTIONAL FACT WITHOUT SUPPORT OF EVIDENCE—QUESTION OF LAW.—The circumstance that that act, in addition to the declaration that the findings of the commission on questions of fact are to be conclusive, declares that "such questions of fact shall include ultimate facts," does not change the rule that the power of review extends to the inquiry whether a finding of a jurisdictional fact is wholly without the support of any substantial evidence. Such inquiry presents a question of law.

ID.—ACCIDENT—COURSE OF EMPLOYMENT—ALTERCATION BETWEEN RAILROAD FOREMAN AND LABORER.—Personal injury inflicted on a foreman in charge of a gang of section hands on a railroad by one of the laborers under him, in an altercation between them which grew out of the foreman's justifiable efforts to maintain his authority as foreman and to protect the property of his employer entrusted to his care, is an "accident" arising out of and in the

course of the foreman's employment, within the meaning of the Workmen's Compensation Act.

ID.—INJURY RESULTING FROM WILLFUL OR CRIMINAL ASSAULT.—The fact that the injury was the result of a willful or criminal assault by another does not exclude the possibility that it was caused by accident.

APPLICATION for a Writ of Review directed to the Industrial Accident Commission of the State of California.

The facts are stated in the opinion of the court.

E. F. Conlin, for Petitioner.

Christopher M. Bradley, and A. L. Sapiro, for Respondents.

SLOSS, J.—This is an original proceeding in *certiorari*, to review an award of the Industrial Accident Commission, awarding compensation to one L. Rudder for injuries claimed to have been received by him in the course of his employment by Ocean Shore Railroad Company. Western Indemnity Company, the petitioner for the writ, was a party to the hearing before the commission, and was held liable for the compensation as insurer of the railroad company. On April 12, 1914, the date of the alleged injuries to Rudder, the "Workmen's Compensation, Insurance and Safety Act" of 1913 (Stats. 1913, p. 279) had, according to its terms, gone into effect. The constitutionality of the act (commonly known as the Boynton Act) is involved here, as it is in a number of other cases under submission. In most of the cases the parties have submitted this issue upon the arguments and briefs presented in *Great Western Power Co.* v. *Pillsbury, ante,* p. 180, [149 Pac. 35]. In that case we found it unnecessary to consider the validity of the main features of the enactment. Now, however, a determination of the questions presented in this behalf becomes necessary and proper.

The Boynton Act superseded the act of 1911 (known as the Roseberry Act) [Stats. 1911, p. 796], which was the basis of the rights asserted in the Great Western Power case. The most striking difference between the two laws is that the compensation provisions of the later statute are compulsory on all employers and employees coming within its terms, while the Roseberry Act gave to both employers and employees a

CLXX Cal.—44

right of election in this regard. A brief summary of the later law must precede any discussion of the points made against its validity.

Sections 1 and 2 provide a short title for the act, and define the terms used in it. Sections 3 to 11 provide for the appointment and organization of a board of three members, to be known as the Industrial Accident Commission, and declare the general powers of the board. Sections 12 to 35 deal with the subject of compensation for industrial accidents. Section 12 follows, with slight changes, the phraseology of section 3 of the Roseberry Act. It declares that: "Liability for the compensation provided by this act, in lieu of any other liability whatsoever, shall, without regard to negligence, exist against an employer for any personal injuries sustained by his employees by accident arising out of and in the course of the employment and for the death of any such employee if the injury shall proximately cause death, in those cases where the following conditions of compensation concur:

(1) Where, at the time of the accident, both the employer and employee are subject to the compensation provisions of this act.

(2) Where, at the time of the accident, the employee is performing service growing out of and incidental to his employment and is acting within the course of his employment as such.

(3) Where the injury is proximately caused by accident, either with or without negligence, and is not so caused by the intoxication or the willful misconduct of the injured employee." By the second subdivision (b) of section 12, the right to compensation under the act, where the required conditions concur, is made the exclusive remedy against the employer, except where certain delinquencies on the part of the employer have caused the injury.

Section 13 defines "employer" as including, in addition to the different governmental agencies, every person, association, or corporation "who has any person in service under any appointment or contract of hire, or apprenticeship, express or implied. . . ." By section 14 "employee" is defined to mean "every person in the service of the employer as defined by section 13 hereof under any appointment or contract of hire . . .," excluding any person whose employment is both casual and not in the usual course of the trade, business, pro-

fession or occupation of his employer, and also excluding any employee engaged in farm, dairy, agricultural, viticultural, or horticultural labor, in stock or poultry raising or in household domestic service. Section 15 contains an elaborate schedule for fixing the compensation to the injured employee, or to his dependents where death results, the scale being based in part on the earnings of the injured person. Sections 16 to 20 limit the time within which proceedings for collection may be instituted, provide methods for computing the earnings or loss of wages which are a factor in the allowance to be made, and define the dependents who are to be compensated in case of death. Sections 22 to 33 deal with the procedure to be followed on applications to the commission, and kindred matters, section 25 declaring that "after final hearing by the commission, it shall, within thirty days, make and file (1) its findings upon all facts involved in the controversy, and (2) its award, which shall state its determination as to the rights of the parties."

Sections 36 to 50 provide for the creation and administration of a "state compensation insurance fund." We shall have occasion, at a later point in the discussion, to give a more detailed statement of these provisions. The questions raised in this case make it unnecessary to go into particulars regarding sections 51 to 72, which give the commission power to make and enforce safety rules and regulations, to prescribe safety devices, and to order the reporting of accidents.

Sections 73 to 80 declare the powers of the commission with respect to procedure. Sections 81 to 83 provide for the authority of the board to grant rehearings.

Sections 84 and 85 authorize a review of the orders and awards of the commission by the supreme court or by the district court of appeal of the appellate district in which the applicant resides. The only method of review is by means of a writ of *certiorari,* and it is provided that the review "shall not be extended further than to determine whether or not:

(1) The commission acted without or in excess of its powers.

(2) The order, decision, or award was procured by fraud.

(3) The order, decision, rule, or regulation is unreasonable.

(4) If findings of fact are made, whether or not such findings of fact support the order, decision, or award under review."

It is declared in section 84 that "the findings and conclusions of the commission on questions of fact shall be conclusive and final and shall not be subject to review; such questions of fact shall include ultimate facts and the findings and conclusions of the commission."

Section 86 demands a liberal construction of the act, and provides that "if any section . . ., sentence, clause or phrase of this act is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining portions of this act."

The concluding sections (87 to 92) have no bearing on the questions we are about to consider.

Attention should also be called to section 21 of article XX of the constitution, added by vote of the electors on October 10, 1911, prior to the enactment of the Boynton Law. This section reads: "The legislature may by appropriate legislation create and enforce a liability on the part of all employers to compensate their employees for any injury incurred by the said employees in the course of their employment, irrespective of the fault of either party. The legislature may provide for the settlement of any disputes arising under the legislation contemplated by this section, by arbitration, or by an industrial accident board, by the courts, or by either any or all of these agencies, anything in this constitution to the contrary notwithstanding."

Both the federal constitution and the constitution of this state are invoked in support of the assault made upon the law.

The clauses of the fourteenth amendment guaranteeing "due process of law" and "the equal protection of the laws" are, it is alleged, violated by the scheme of legislation embodied in the Boynton Act. The enactment substitutes a new system of rights and obligations for the common-law rules governing the liability of employers for injuries to their workmen. The change thus made is radical, not to say revolutionary. In place of the old action, in which the employer was liable only if he, or some one representing him, had been guilty of negligence or misconduct, the new law imposes upon the employer a liability for any accidental injuries to his employees arising out of the employment—a liability not conditioned upon any negligence of the employer, or any want of negligence on the part of the employee. All that is required is that the injury shall not have been caused by the intoxica-

tion or the willful misconduct of the injured employee. Stating the change another way, the long established doctrines of contributory negligence, of assumption of risk and of negligence of a fellow-servant are by this law swept out of existence, and are given no weight in proceedings by employees against employers on account of injuries received in the employment. It may be noted that under the particular scheme embodied in this act, the loss resulting from accidental injuries is not imposed upon the employer alone. The scale of compensation fixed by section 15 allows to the employee, in addition to medical and surgical expenses, an indemnity based upon his loss of earnings, but this indemnity covers not the whole, but only a part or a percentage of such loss. The risk of accidental injuries is thus shared by employer and employee.

Fundamental as are the changes thus made, they are not peculiar to the legislation of this state. They are the concrete expression of sentiments and beliefs that are widely prevalent, and that have exerted a compelling force in influencing similar enactments in many other states and countries. Limiting our reference to jurisdictions in which the common law has furnished the main standards of decision, it is found that statutes embodying the underlying principles of the act under review have been enacted in Great Britain, in various British colonies and in more than twenty states of the Union. (Bradbury, Workmen Compensation Law, secs. 5, 6.) Many of these laws, like the California statute of 1911 (commonly known as the Roseberry Act), are made applicable only to employers and employees electing to be bound by them. Others provide a compulsory scheme of compensation, as does the act now before us. But, whether elective or compulsory, these statutes, one and all, rest on the underlying notion that the common-law remedy by action, with the requirements of proof incident to that remedy, involves intolerable delay and great economic waste, gives inadequate relief for loss and suffering, operates unequally as between different individuals in like circumstances, and that, whether viewed from the standpoint of the employer or that of the employee, it is inequitable and unsuited to the conditions of modern industry. These considerations are elaborated in the many reports that have been made under legislative authority, and are outlined in a number of judicial decisions, some of which we shall have occasion

to cite. Without undue expansion of the discussion, it may be said, in a few words, that the theory of this legislation is that the risk of injury to workmen in the industries governed by the law should be borne by the industries, rather than by the individual workman alone. As the ultimate result, the burden imposed in the first instance upon the employer, will, it is said, be distributed, as part of the cost of production, among the consuming public.

Does a statute giving effect to this theory deprive the employer of liberty or property without due process of law, or deprive him of the equal protection of the laws?

If such a law may be given force, the sanction for it must be found in that legislative authority usually termed the police power. The broad and all-pervading scope of this power makes a satisfactory definition of it impossible. Its general nature and extent are declared in a number of decisions of the supreme court of the United States. We shall not repeat the oft-quoted and familiar expressions used in these decisions. For the purposes of this discussion, the police power is, we think, adequately and well described by the supreme court of Washington in these words: "By means of it, the legislature exercises a supervision over matters affecting the common weal and enforces the observance by each individual member of society of duties which he owes to others and the community at large. The possession and enjoyment of all rights are subject to this power. Under it, the state may 'prescribe regulations promoting the health, peace, morals, education, and good order of the people, and legislate so as to increase the industries of the state, develop its resources and add to its welfare and prosperity.' In fine, when reduced to its ultimate and final analysis, the police power is the power to govern." (*State* v. *Clausen*, 65 Wash. 156, 177, [37 L. R. A. (N. S.) 466, 117 Pac. 1101].)

The arbitrary taking of life, liberty, or property cannot, of course, be justified by referring the act to the police power. But, if a given piece of legislation may fairly be regarded as necessary or proper for the protection or furthering of a legitimate public interest, the mere fact that it hampers private action in a matter which had theretofore been free from interference is not a sufficient ground for nullifying the act.

Statutes aiming at the same general purpose as that sought by the Boynton Act have, in a majority of the decided cases,

been held good as against the attack that they violated the
fourteenth amendment.   Some of these cases arose under stat-
utes which made the compensation provisions elective.   (*State
v. Creamer,* 85 Ohio St. 349, [39 L. R. A. (N. S.) 694, 97
N. E. 602] ; *Mathison* v. *Minnesota St. Ry. Co.,* 126 Minn. 286,
[148 N. W. 71] ; *Cunningham* v. *Northwestern Imp. Co.,* 44
Mont. 180, [119 Pac. 554] ; *Borgnis* v. *Falk Co.,* 147 Wis. 327,
[37 L. R. A. (N. S.) 489, 133 N. W. 209] ; *Hawkins* v. *Bleak-
ley,* 220 Fed. 378; *Mackin* v. *Detroit-Timkin A. Co.* (Mich.),
153 N. W. 49.)   And while, in several of these decisions, the
court was careful to point out that the validity of a com-
pulsory compensation act was not involved, yet the general
line of reasoning employed in most of the cases would, if pur-
sued to its logical results, go far toward sustaining even such
an act.

Counsel have cited but two decisions dealing directly with
the validity of acts which make the scheme of compensation,
irrespective of negligence, compulsory with respect to em-
ployers and employees.   And in these cases opposing conclu-
sions were reached.   In *Ives* v. *South Buffalo Ry. Co.,* 201
N. Y. 271, [Ann Cas. 1912B, 156, 34 L. R. A. (N. S.) 162, 94
N. E. 431], the court of appeals of New York declared that
the statute of 1910, providing a system of workmen's com-
pensation for certain employments, was in conflict with the
constitution, in two respects: (a) because it deprived the em-
ployer of property without due process of law, and (b)
because it deprived both employer and employee of the right
to trial by jury, guaranteed by the constitution of the state.
The second ground, whether well taken or not, has no applica-
tion to the case at bar, for although our constitution has
always contained a provision securing the right of trial by
jury (art. I, sec. 7), the legislature is, as we have already
pointed out, expressly authorized by section 21 of article XX,
to provide for the settlement by arbitration, by a board, or
by the courts, of disputes involving the liability of employers.
This section, adopted in 1911, worked a repeal, *pro tanto,* of
any conflicting provision which may have been in force there-
tofore.

On the other point, that of "due process," the main stress
of the opinions in the Ives case is laid upon the proposition
that the statute imposes a liability upon an employer who has
been guilty of no fault, and who, under the pre-existing law,

was under no obligation to compensate his employee for an injury. This, it is declared, is a violation of the employer's constitutional rights.

On the other hand, in *State* v. *Clausen,* 65 Wash. 156, [37 L. R. A. (N. S.) 466, 117 Pac. 1101], the validity of an act similar, in its main purpose, to the New York statute and to the Boynton Act, was upheld, the court handing down an exhaustive and able opinion to support its conclusion.

The essence of the decision in the Ives case is that freedom from liability on the part of an employer who has been guilty of no fault is a fundamental property right of which he cannot be deprived by mere legislative declaration. With all possible respect for the eminently learned court which pronounced this decision, we are unable to give our assent to the doctrine. The rules of the common law defining the rights and obligations of persons holding various mutual relations are not necessarily expressions of fixed and immutable principles, inherent in the nature of things. "A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will . . . of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstance.". (*Munn* v. *Illinois,* 94 U. S. 113, 134, [24 L. Ed. 77] ; *Martin* v. *Pittsburg etc. R. R. Co.,* 203 U. S. 284, 294, [8 Ann. Cas. 87, 51 L. Ed. 184, 27 Sup. Ct. Rep. 100] ; *The Lottawanna,* 21 Wall. 558, 577, [22 L. Ed. 654] ; *Western Union Tel. Co.* v. *Com. Milling Co.,* 218 U. S. 406, 417, [21 Ann. Cas. 815, 36 L. R. A. (N. S.) 220, 54 L. Ed. 1088, 31 Sup. Ct. Rep. 59].) In accordance with this view, the supreme court of the United States, in *Mondou* v. *New York etc. R. R. Co.,* 223 U. S. 1, [38 L. R. A. (N. S.) 44, 56 L. Ed. 327, 32 Sup. Ct. Rep. 169], sustained the validity of the federal Employers' Liability Act, which, in the cases covered by the act, abrogated the fellow-servant rule, and greatly restricted the operation of the defenses of contributory negligence and assumption of risk. Indeed, the legislative control over some of the doctrines of law relating to this class of cases is con-

ceded by the court in the Ives case, it being said, in the main opinion, that "the statutory modifications of the 'fellow-servant' rule and the law of 'contributory negligence' are clearly within the legislative power. These doctrines, for they are nothing more, may be regulated or even abolished." And the concession goes no further than would be necessary to avoid conflict with a strong and uniform body of authority. (*Mathison* v. *Minnesota St. Ry. Co.,* 126 Minn. 286, [148 N. W. 71, 73], and cases cited; *State* v. *Creamer,* 85 Ohio St. 349, [39 L. R. A. (N. S.) 694, 97 N. E. 603]; *Cunningham* v. *Northwestern Imp. Co.,* 44 Mont. 180, [119 Pac. 554]; *Borgnis* v. *Falk Co.,* 147 Wis. 327, [37 L. R. A. (N. S.) 489, 133 N. W. 209].)

The line is sharply drawn, however, by the New York court of appeals, between the fellow-servant and contributory negligence rules, on the one hand, and the rule that fault on the part of the employer must be shown, on the other. Why this distinction? Is the latter doctrine any more sacred or inherently necessary than either of the former? Under the common law the burden of industrial accident, where no fault was attributable to employer or workman, fell on the workman. Under the new law it falls, primarily at least, on the employer. It cannot be said that the one rule or the other is a necessary or logical result of fundamental principles of justice. The very trend of legislation exemplified by the act before us illustrates how general is the belief that an enlightened conception of justice requires that the old rule be superseded by the new. There is nothing contrary to the permanent and underlying notions of human right in the declaration that he who is conducting an enterprise, in the operation of which injury to others is likely to occur, shall respond for such injury to those who have not, by their own willful misconduct, brought it upon themselves. "The position in the line of causation which employers sustain in modern industrial pursuits is of course the basic fact on which employer's liability laws rest." (*State* v. *Creamer,* 85 Ohio St. 349, [39 L. R. A. (N. S.) 694, 97 N. E. 602, 606].) Such a change in the "law itself, as a rule of conduct" is as fairly within the scope of legislative power as is the abolition of the defense of fellow-servant or that of contributory negligence. If the lawmaking body deems such change to be needed for the furtherance of the general well-being, it is taking a view that may at

least be entertained by reasonable minds, and its action is justified by the broad authority embraced within the police power.

The fourteenth amendment was "intended to prevent the arbitrary exercise of power, or undue, unjust and capricious interference with personal rights; not to prevent those reasonable regulations that all must submit to as a condition of remaining a member of society." (*State* v. *Clausen*, 65 Wash. 156, [37 L. R. A. (N. S.) 466, 117 Pac. 1101].) The state is prohibited from taking life, liberty, or property without due process of law, whether that taking be accomplished by administrative action, by judicial decree, or through the form of enacting a statute. Laws must be framed so as to respect existing and vested property rights, and so as to operate equally upon all who are similarly situated with respect to such laws. But the laws defining rights of property, personal relations, or the obligations of individuals to their fellow-beings or to the state may, in general, be molded and altered by the states at will, if the change does not affect acts previously done, nor property rights previously acquired. Therefore, a law which disturbs no vested right of property, which is not retroactive in its operation upon the conduct of persons, but which, looking to the future, merely changes the existing rules governing the liability of masters for injuries caused by accidents occurring to their servants while in the service, does not come within the scope of the fourteenth amendment. It is simply an exercise by the state of its governmental power to pass laws regulating the ordinary private rights of persons and property. The law in question is of this character. It does not affect past transactions or previously acquired rights of person or property. It provides for a notice and a hearing as to liabilities arising under it, and it bears alike upon all affected by its provisions.

It is not to be supposed that the line of reasoning outlined by us would support any and every legislative attempt to transfer burdens from one class of persons to another, upon the theory, merely, that it is for the common welfare that such burdens be borne by the persons upon whom they are thus imposed. It is impossible to point out, in advance, the line which would separate legitimate legislative regulation from arbitrary spoliation. A change in obligations and liabilities must rest upon some substantial reason, founded on

the mutual relations of persons, or their relations to the public. It would not be questioned, for example, that the law regulating the relative rights and duties of husband and wife, of parent and child, or of carriers and the public, may be radically altered by the legislature. Indeed, vital changes in these matters are of every-day occurrence. In each of these instances the relation of the parties is such as to furnish a reason and a justification for governmental regulation. The same may be said of employer and employees. The employment creates a *status* involving relative rights and obligations, and it is properly for the legislature, acting within the bounds of fairness and reason, to determine the nature, extent, and application of those rights and obligations. If the law-making body determines that one of the incidents of that relation shall be that the employer must compensate his, employee for an accidental injury received in the service, an enactment to that end is neither arbitrary nor outside the scope of legislative authority.

The fixing of liability on one who is without fault is not new to the law. The opinion of the Washington supreme court in *State* v. *Clausen, supra,* gives numerous instances of such liability, both at common law and under statutes which have withstood attack on constitutional grounds. Some, at least, of the cases thus referred to cannot, we think, be distinguished from the case at bar, so far as the point now under discussion is concerned.

We have not overlooked the circumstance that the Boynton Act, unlike some of the other statutes to which we have referred, does not limit the newly created scheme of compensation to specially enumerated industries, selected as and declared to be extra-hazardous in character. We do not conceive that this difference has any real bearing upon the constitutional questions heretofore discussed. The legislative power to impose the liability upon an employer who is without fault does not, in the view of the courts which have dealt with the subject, rest upon the consideration that the particular employer is conducting an industry in which injury is more likely to result than in some other. If the burden may be imposed upon any employer conducting a lawful and necessary industry, it may be imposed upon all who are conducting industries in which, in the judgment of the legislature, the public welfare requires this measure of protection.

Nor do we think that any distinction, so far as constitutional objections are concerned, can be based upon the fact that this act imposes upon the employer a liability to compensate his employees for injuries actually received in the particular employment, while under other statutes—for example, that of Washington—all employers are required to contribute sums, proportioned to their pay-roll and graduated according to the nature of the industry, into a fund out of which all claims for compensation are to be paid. The essential question is whether liability for injury suffered by employees through accident may be imposed upon employers' who have been guilty of no breach of duty. Once this question is answered in the affirmative, the mode of imposing the liability, whether it be by way of a proportionate contribution having some of the characteristics of a tax, or by fixing a direct liability upon each employer for each accident as it occurs, is a matter for legislative determination.

Furthermore, the Boynton Act provides for a system of compensation insurance by the state or by private insurers "for the purpose of insuring employers against liability for compensation under this act" (sec. 36), and declares that an employer who is insured against liability for the full amount of compensation payable or to become payable may be relieved from liability by giving certain notices to the parties interested. (Sec. 34.) In other words, under the California law the employer has it in his power to protect himself against personal liability by taking out the insurance provided for, paying therefor, of course, the premiums fixed in accordance with the hazards of the industry and the circumstances surrounding the particular work affected. (Sec. 40.) The employer who takes advantage of this privilege is subjected to a burden not substantially different from that imposed by the Washington statute upon all employers within the classes affected by that statute. If there be any force in the argument that the Washington scheme is a reasonable burden upon the employer, while the imposition upon him of direct liability for injuries is unreasonable and arbitrary, the contention is fully met by pointing out that under our law each employer has the option of limiting the burden within precisely the same bounds as those fixed by the system in force in Washington. In this connection it may be pointed out that the same court that decided the Ives case has, in a de-

cision rendered within the past few weeks, sustained the validity of a statute giving to injured employees in specified industries the right to receive prescribed compensation based on earnings, the payments to be made out of a fund created from premiums paid by the employers. The employer may, under the statute, insure with corporations or associations authorized to transact such business, and is relieved from any liability beyond the compensation prescribed in the act by paying the premiums into the state fund or by paying the prescribed compensation directly or through an insurance carrier. If he does not take advantage of any of the options conferred upon him by the act, he is liable to an action for damages in which he is deprived of the defenses of contributory negligence, assumed risk, and negligence of a fellow-servant. This act became a law December 16, 1913, and was enacted pursuant to an amendment to the constitution of the state of New York adopted after the decision of the court in the Ives case. In *Jensen* v. *Southern Pacific Co.*, 215 N. Y. 514, [109 N. E. 600], decided July 13, 1915, the court of appeals held that the statute in question did not violate the fourteenth amendment to the constitution of the United States.

For these reasons, which might be fortified and elaborated if considerations of space permitted, we are satisfied that the statute is not obnoxious to the provisions of the fourteenth amendment.

Various objections arising under the state constitution are also urged. These are all based on the clause excluding from the operation of the act casual employees and employees engaged in farm, dairy, agricultural, viticultural, or horticultural labor, in stock or poultry raising, or in household domestic service. It is first claimed that no exceptions are permissible under our constitutional enabling clause (art. XX, sec. 21). This clause authorizes the legislature to create a liability on the part of *all* employers to compensate their employees, etc. The use of the word "all," it is claimed, takes away the power of the legislature to except any employer from the operation of the act. The only power granted is to create a liability on the part of all. But this, we think, is a strained construction of the amendment. Section 21 was adopted for the purpose of establishing the right of the legislature to pass laws on the particular subject. It was a grant

of power, and the word "all" was inserted in order to make the power broad and comprehensive. The legislative authority was declared to extend over all employers. The grant was thus universal in scope, and could be exercised by the legislature to such an extent as it saw fit, provided, of course, that any exceptions made did not violate some independent provision of the constitution. In other words, on the principle that the greater includes the less, power to legislate for the whole body of employers embraces power to legislate for a part of the body.

The exceptions are claimed to make the law vulnerable as special legislation. It can no longer be necessary to cite authorities in support of the power of the legislature to make different laws for different classes of persons, provided the classification be based on some rational ground of differentiation. And the conclusion of the legislature on this point will be sustained unless it is manifestly without support in reason. That casual employees form a special class, which might fairly be regarded as not requiring the protection of the new law, is obvious enough, and is, indeed, not questioned by the petitioner. A more serious question is presented by the exclusion of employees in the various branches of agricultural pursuits and in domestic service. But here, too, in view of the very liberal rules established by our decisions on the legislative power of classification, it must be held that the law-making body might reasonably have found that the conditions of agricultural and of domestic employment were so far different from those surrounding other employments as to justify the limiting of the new compensation law to these other employments. "The legislature is not bound, in order to support the constitutional validity of its regulations, to extend it to all cases which it might possibly reach. Dealing with practical exigencies, the legislature may be guided by experience. It is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest." (*Miller* v. *Wilson,* 236 U. S. 373, [59 L. Ed. 628, 35 Sup. Ct. Rep. 342] ; see, also, *In re Miller,* 162 Cal. 687, [124 Pac. 427].) Unless the classification is palpably arbitrary, it must stand. The respondent suggests various grounds which might well have guided the legislature in making the exceptions complained of, as that farm laborers, and those engaged in the kindred excepted forms of work,

are, as a rule, engaged in "open and detached employments," under conditions "largely created and controlled by them," and for these, and other reasons, less likely to produce injuries. Similar arguments might be applied to the case of domestic service. Finally, it may be said that the course of decision in other states supports the view that exceptions like these are an exercise of the legitimate legislative power of classification, and do not evidence an arbitrary discrimination. (Opinion of Justices, 209 Mass. 607, [96 N. E. 308] ; *Mathison* v. *Minnesota St. Ry. Co.*, 126 Minn. 286, [148 N. W. 71] ; *Dirken* v. *Great Northern P. Co.*, 110 Me. 374, [Ann. Cas. 1914D, 396, 86 Atl. 320] ; *Mackin* v. *Detroit-Timkin Co.* (Mich.), 153 N. W. 49.)

Accepting, then, the Boynton Act as a valid measure of the rights of the parties, we come to the merits of the particular case.

The commission first made its findings of fact in general terms. Finding No. 1 was to the effect that Rudder was injured by accident on April 12, 1914, while in the employ of Ocean Shore Railroad Company, and that said accident arose out of and happened in the course of said employment. Finding No. 2 declared that said accident happened while the injured employee was performing a service growing out of, incident to, and in the course of his employment, and was not caused by the willful misconduct or intoxication of said employee. Subsequently, on motion of the Western Indemnity Company, the commission made amended findings, amending finding No. 1 to read as follows:

"1. That L. Rudder, applicant herein, was injured by accident on the 12th day of April, 1914, while in the employment of defendant, Ocean Shore Railroad Company, and that said accident arose out of and happened in the course of said employment and in the manner following:

"a. Said Rudder was a section foreman in charge of a special gang of fifteen or twenty section hands, mainly Greeks, in the employment of the Ocean Shore Railroad Company, at or near Mussel Rock, San Mateo County, California.

"b. One George Pappas, a Greek, was not doing his work in a proper way and applicant Rudder remonstrated with him and took the shovel from his hands and showed Pappas how to do the work right, but Pappas continued to do the work in the wrong manner and Rudder told him to drop his shovel .

and get his time. Pappas did not drop his shovel and Rudder undertook to take it from him. Pappas resisted and struck Rudder with the flat side of the shovel, Rudder saying, 'I will make you drop that shovel,' stepped back a few paces and laid hold of a jackstick five or six feet long and as large around as one's wrist, and returned to where Pappas was. Pappas meantime had seized a rock, but, upon the approach of Rudder, dropped the rock and struck at Rudder with the shovel, missing him, whereupon Rudder struck Pappas on the side of the head with the jackstick. Falling to his knees by reason of the force of the blow, Pappas grabbed Rudder about the feet, tripped him and threw him between the rails, climbed on top of him, and, for the period of about fifteen minutes, tore the flesh on Rudder's face, hands, and arms with his teeth, inflicting severe lacerations which were followed by blood poisoning and serious and prolonged disability resulting therefrom.''

The contention of the petitioner is that these findings are not sustained by the evidence. We need not here restate our views regarding the extent to which the court may, under a writ of *certiorari,* inquire into the sufficiency of the evidence to sustain findings of the jurisdictional facts underlying the power of the commission to award compensation. That question was elaborately discussed in *Great Western Power Co.* v. *Pillsbury, ante,* p. 180, [149 Pac. 35], recently decided. The award reviewed in *Great Western Power Co.* v. *Pillsbury* was made under the Roseberry Act, but there is no substantial difference between that law and the Boynton Act so far as this phase of the case is concerned. Under either law it is essential to the power to make an award that the injury shall have been caused by accident to an employee acting within the course of his employment. In both acts the findings of the commission on questions of fact are declared to be conclusive, and the circumstance that the Boynton Act declares in addition that "such questions of fact shall include ultimate facts," etc., does not change the rule that the power of review extends to the inquiry whether a finding of a jurisdictional fact is wholly without the support of any substantial evidence. Such inquiry, as was explained in the decision just referred to, presents a question of law.

It may be proper at this point to say a word in approval of the course adopted by the commission in amending its find-

ings of fact so as to show specifically the occurrences which, in its view of the evidence, were shown to have taken place. While we do not question the legal power of the commission to limit the findings to the ultimate facts set forth in the statute, the practice of making specific findings will in many cases not only be fairer to the parties who may wish to seek a review of the final determination reached, but will also be helpful to the reviewing court in its effort to ascertain whether that determination may be sustained.

The main contentions of the petitioner are that there is no evidence to show either that Rudder's injuries were the result of accident, or that the injuries happened while Rudder was performing a service incidental to and in the course of his employment.

The amended first finding, like the first one, declares the ultimate fact that Rudder was injured by accident and that the accident happened in the course of his employment. Probative or specific facts are found in addition, but they are not declared to be the sole basis from which, as a matter of necessary inference and conclusion, the ultimate facts are drawn. If we apply the analogy of an appeal from a judgment, the probative facts found cannot prevail over the findings of ultimate fact, unless necessarily in conflict with such finding. (*People* v. *McCue,* 150 Cal. 195, [88 Pac. 899].) If the specific findings have the support of evidence, and if those findings, with the aid of fair inferences, sustain the findings of ultimate fact, the action of the commission cannot be overthrown.

We shall not stop to discuss the question whether the evidence sustains the findings of the commission regarding the particular circumstances under which the injuries to Rudder occurred. On this point it is sufficient to say that there is at the least a substantial conflict in the evidence, and that the commission in finding as it did was acting within its jurisdiction. Its disposition of the questions of fact on which the evidence was thus conflicting is final and conclusive here.

There remains the question whether, accepting as true the specific facts found, the commission erred as matter of law in holding and finding that those facts showed an injury by accident in the course of Rudder's employment. This question must be answered in the negative. The circumstance that the injury was the result of a willful or criminal assault by

CLXX Cal.—45

another does not exclude the possibility that the injury was caused by accident. (1 Bradbury on Compensation, 2d ed., 505.) In discussing the English Compensation Act, Lord Macnaghten said in *Fenton* v. *Thorley & Co., Ld.,* (1903), A. C., 443: "The expression 'accident' is used in the popular and ordinary sense of the word, as denoting an unlooked for mishap or an untoward event which is not expected or designed." This court has defined "accident" as "a casualty—something out of the usual course of events, and which happens suddenly and unexpectedly, and without any design on the part of the person injured." (*Richards* v. *Travelers Ins. Co.,* 89 Cal. 170, [23 Am. St. Rep. 455, 26 Pac. 762]; *Price* v. *Occidental Life Ins. Co.,* 169 Cal. 800, 147 Pac. 1175].) Under these and other authorities, it is clear that an injury caused by the attack of a third person may be accidental so far as the injured person is concerned. On the other issue—whether the injury occurred in the course of the employment of Rudder, it must also be held that the finding of the commission was sustained by sufficient evidence. The question, simply stated, is whether the injury resulted from Rudder's undertaking to do something in the line of his duty or whether it occurred as the result of his going outside the scope of his employment and entering upon a private quarrel for reasons of his own. The facts found justify the inference that Rudder was hurt in an altercation which grew out of his justifiable efforts to maintain his authority as foreman and to protect the property of his employer entrusted to his care. There is no occasion to elaborate the discussion on this point. In its last analysis the petitioner's argument rests upon a supposed state of facts which was not established to the satisfaction of the commission, and which was not shown by evidence free from conflict.

The award is affirmed.

Lawlor, J., and Angellotti, C. J., concurred.

SHAW, J. concurring.—I concur in the opinion of Mr. Justice Sloss in this cause but I do not agree to all that may be implied from some of the expressions therein. The distress and privations brought upon persons employed in various industries of the state by injuries from their own incautious conduct are great and are sufficient to constitute

a matter of public concern which the state may well redress by any reasonable means. It is reasonable that the burden of relief should primarily fall upon the industries in which the injuries occur and be a part of the expense of production to be ultimately borne by the consumer. The state may provide a reasonable scheme whereby all persons carrying on such industries shall contribute to a fund out of which the persons so injured may be compensated to some extent for the damages inflicted. But I do not agree to the proposition that "liability for injury suffered by employees through accident may be imposed upon employers who have been guilty of no breach of duty," if by this it is meant that the whole burden may lawfully be cast upon innocent employers whose employees are injured, without affording them any means of dividing the burden with more fortunate employers engaged in the industries whose employees have not carelessly hurt themselves. This would not be a reasonable method of accomplishing the public purpose in view. The state's power to compel relief to such employees comes from the fact that the public interest is promoted by having the sufferings of such injured employees alleviated. It is a matter of public concern and is no more the private concern of the particular employer than of any other person who is free from blame. If the Workmen's Compensation Act provided nothing more than that the damages suffered by the employee entirely from his own fault should be wholly paid by his blameless employer, I should say that the means for remedying the public evil was oppressive and unreasonable and that the law so declaring would be invalid. But the law does not stop there. It proceeds to establish a state compensation insurance fund out of which such damages may be paid and to which the employer may resort for his protection. By paying a relatively small sum as insurance he can wholly relieve himself from liability to the employee. In practical operation this will be done and the provisions of the act will place the burden of paying the damages suffered by employees primarily and with substantial equality upon all of the industries affected. The act is, in its effect, the same as the scheme held valid by the supreme court of Washington in *State* v. *Clausen,* cited by Justice Sloss. The only difference is that by the Washington law the contribution to the fund is compulsory, whereas by our law contribution is compelled only

by the self-interest of the employer. Because of this provision I consider the act reasonable; without it I think it would be unreasonable and invalid. The recent decision of the court of appeals of New York in *Jensen* v. *Southern Pacific Co.*, 215 N. Y. 514, [109 N. E. 600], referred to in the main opinion, sustains a law similar to ours in this respect upon substantially the same ground.

LORIGAN, J., and MELVIN, J., concurring.—We concur in the affirmance of the award in this case solely on the ground set forth in the concurring opinion of Justice Shaw.

HENSHAW, J. dissenting.—While I cannot agree with the judgment of my associates, were this an ordinary case, I would remain silent, believing as I do that in general a dissenting opinion works a harm in unsettling confidence in a court, seldom compensated by the value of the dissenter's views. But in the instant case the momentous nature of the constitutional questions involved imposes the duty of speech.

Three decisions, where the scheme of compensation is compulsory have been cited and reviewed. One is *Ives* v. *South Buffalo Ry. Co.*, 201 N. Y. 271, [Ann. Cas. 1912B, 156, 34 L. R. A. (N. S.) 162, 94 N. E. 431]; the second, *State* v. *Clausen*, 65 Wash. 156, [37 L. R. A. (N. S.) 466, 117 Pac. 1101], the third is *Jensen* v. *Southern Pacific Co.* The Ives case is rejected *in toto*, and the majority opinion adopts the reasoning, the citations and much of the language of the Washington case as supporting the law here under review. Yet so different is the Washington case from ours in all vital aspects, in form and substance, in spirit and essence, in cause and consequence, in means and results, that the two are not even of remote kin to each other. Every word of reasoning employed by the Washington court may be, and may be conceded to be, perfectly sound as applied to the law there under review (and of course every legal utterance must be taken in connection with the facts to which it is addressed, in that case the Washington statute) and yet have neither pertinency nor applicability to another law a stranger to it in every essential demanding judicial analysis. So heavily does the prevailing opinion lean upon the Washington decision that it becomes obligatory to establish this statement.

What then was the Washington law?   It dealt solely with employees in extra hazardous employment and with their employers. Because of inevitable casualties occurring to such employees, regardless of fault or negligence, because of the slowness and inadequacy of the method of compensation under proceedings in court, and because the welfare of the state so demanded, it withdrew all right of judicial inquiry into the question of compensation for injuries or death arising in the course of such extra hazardous employments and made provision for the relief of the injured and for the family of the killed, regardless of negligence or fault, by exacting a payment from each employer of a certain annual sum based upon his pay-roll. These sums were to be paid into the state treasury and to be devoted exclusively to the indemnification of those engaged in such extra hazardous occupations who met with accidents, or to the relief of the family and heirs of those who met with death.

What is the reasoning of the Washington court upon this law? It is as follows: The act is not based upon any express constitutional grant of power, and is sustainable, if sustainable at all, as an exercise of the police power (Our law is based on an express constitutional grant, needs no support as an exercise of the police power and is not even referable to the police power, as I shall hereafter show) : the exercise of the police power is always subject to judicial review on the question of its reasonableness (Our law, like every law based on an express constitutional grant of power, may be unreasonable, cruel, and oppressive, but it is not subject to judicial review on this account because it is a part of the supreme law of the state) : employees in extra hazardous occupations are appropriate subjects of protective legislation under the police power, because of the nature of their tasks, their greater danger of injury, their condition generally of dependence on their wages and other like considerations too apparent to require exposition (Our law makes no such discrimination, exercises no selective discretion, but says that every employer shall pay a .fixed sum of money to every injured employee) : the liability upon the employer being a payment into the treasury of a percentage based on his pay-roll, and therefore on the amount of his business, is in its essence a tax, a license-fee or toll, ''partaking both of the nature of a license for revenue and for regulation; and as

such we find nothing in principle inimical to either the state
or federal constitutions." The quotation is from the Wash-
ington decision. Such and similar liabilities have been
created by statute and are not unconstitutional. (In our law
there is no element of fee or tax or toll; no limitation upon
liability as under the Washington law; no payment into a
fund created and controlled by the state under its police
powers, but a direct mandate by the state upon A to give his
property directly to B, if B suffers injury while in his employ.
The two kinds of liability are as wide apart as the polls,
the one being reasonable, determinate, and fixed as a regula-
tory fee under the police power, the other a liability imposed
by fiat of the sovereign power, without regard to the police
power, commanding that all employers pay directly to all
employees indeterminate sums,—amounts which may ruin
them—based upon no fault of the employer, but solely on the
circumstance of the relationship.) Such is the Washington
law and decision. No one can seriously question the sound-
ness of the reasoning and conclusion of the Washington court
as applied to the law before it. Indeed, without in the least
disparaging the great learning, research, and pellucid presen-
tation made by the distinguished author of the opinion, nor
yet the value of it to both bench and bar, it may be said that
the Washington law could have been supported and the case
securely rested on the authority alone of *Noble State Bank* v.
*Haskell,* 219 U. S. 104, [Ann. Cas. 1912A, 487, 32 L. R. A.
(N. S.) 1062, 55 L. Ed. 112, 31 Sup. Ct. Rep. 186]—which
case indeed is cited and quoted. The following language from
the Haskell case is the essence of the decision: "In the first
place it is established by a series of cases that an ulterior
public advantage may justify a comparatively insignificant
taking of private property for what, in its immediate purpose,
is a private use. (*Cark* v. *Nash,* 198 U. S. 361, [4 Ann. Cas.
1171, 49 L. Ed. 1085, 25 Sup. Ct. Rep. 676]; *Strickley* v.
*Highland Boy Mining Co.,* 200 U. S. 527, 531, [4 Ann. Cas.
1174, 50 L. Ed. 581, 20 Sup. Ct. Rep. 301]; *Offield* v. *New
York etc. R. R. Co.,* 203 U. S. 372, [51 L. Ed. 231, 27 Sup. Ct.
Rep. 72]; *Bacon* v. *Walker,* 204 U. S. 311, 315, [51 L. Ed.
499, 27 Sup. Ct. Rep. 289].) And in the next, it would seem
that there may be other cases besides the every day one of
taxation, in which the share of each party in the benefit of a
scheme of mutual protection is sufficient compensation for the

correlative burden that it is compelled to assume.   See *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, [41 L. Ed. 729, 20 Sup. Ct. Rep. 576].   At least, if we have a case within the reasonable exercise of the police power as above explained, no more need be said.''

The character and scope of the Washington case has been sufficiently set forth.   A word of similar explanation is due to the Ives case.   The law in that case imposed a fixed arbitrary liability upon employers for compensation to employees injured through no fault of the former.   In this aspect it is · identical in principle with our own law.   Unlike our law, however, it limited this liability to employees in extra hazardous occupations, and it had no express constitutional authority to support it.   The court of appeals of New York held· that the liability so imposed worked an unconstitutional taking of property in violation of article I of section 6, of the constitution of New York, and of the fourteenth amendment of the constitution of the United States.   In this I believe the New York court to have reached an unassailable conclusion.   The court's opinion in the Ives case has been construed to mean that the legislature can create no liability unknown to the common law, precisely as the Washington case has been construed to mean that that court has said that the legislature may create any new form of liability, though it work the confiscation of property.   Neither construction is warranted.   The court of New York no more said the one thing than did the court of Washington say the other.   The New York court said that the liability under its review did violence to common-law principles, to the spirit of our jurisprudence, and to constitutional safeguards, state, and national.   In this I think it was absolutely right.   The Washington court declared that the liability under its review was in the nature of a regulatory tax or toll, reasonable in character and limited in amount, addressed to a subject (the employees in extra hazardous occupations) peculiarly calling for the exercise of the police power, and promoting their welfare by means sustainable under all authorities, at least since the decision in *Noble State Bank* v. *Haskell,* 219 U. S. 104, [Ann. Cas. 1912A, 487, 32 L. R. A. (N. S.) 1062, 55 L. Ed. 112, 31 Sup. Ct. Rep. 186].   In this (aside from consideration of the deprivation of employer and employee of the right of trial by jury,—of the common-law right secured

by the constitution to prosecute and defend an action in tort for negligence) I think it was absolutely right. Our case is essentially the Ives case. Here, as subsequently in New York by constitutional amendment, the difficulties with the law arising under the state constitution have been eliminated by making the law, in effect, a part of the constitution.

The court of appeals of New York has affirmed the constitutionality of its new law based on this constitutional amendment in the recent case of *Jensen* v. *Southern Pacific Co.*, 215 N. Y. 514, [109 N. E. 600], cited in the prevailing opinion. The decision itself is a disappointment in not making it plain how a mere amendment to the state constitution can set aside the legal conclusion that such a law does violence to the federal constitution, as was so distinctly declared and so ably reasoned in the Ives case. The learned author of the Ives case does not participate in the Jensen decision, and the Jensen decision contents itself, first, with the declaration that the statutes under consideration in the Ives case and in the Jensen case are so radically dissimilar that the Ives case ceases to be applicable as authority; and, in the second place, the opinion in the Jensen case turns to the decision of the supreme court of the United States in Noble State Bank for its support, after reasoning apparently that the compulsory scheme of insurance contemplated in the new act does away with the vice of the imposition of a direct pecuniary liability without fault. The statute under consideration in New York is in many respects similar to the statute of this state. It differs, however, in one particular of consequence. It applies only to employees in hazardous or extra hazardous occupations, not to all employees, as does the law of this state. A reasonable argument may be made that employees in such occupations will be presumed, to be dependent, for, if not dependent upon their occupations they would seek safer modes of employment. But no such argument can, of course, be made in support of our law.

If I correctly apprehend the views of my associates, some of them hold that this direct liability imposed on the employer to pay his employee is valid as an exercise of the police power; others hold that by the insurance feature of the act this liability is transformed till it becomes a mere license fee or toll as is the Washington case, or a ''comparatively insignificant'' contribution, in the nature of such a fee, properly exacted as

an exercise of the police power under the authority of the Haskell case, as held in the Jensen case. The Ives case flatly, and I think correctly, held that the imposition of the liability did violence to the constitution of the United States. The later decision does not in the least attempt to explain how the difficulty is obviated by an amendment of the state constitution, but declares merely that the compulsory insurance made a part of the law places the whole law within the protective sanctuary of the Haskell case. In a sense there is a similarity between the Haskell case and the New York case. It appears in this. In the Haskell case people who had actually sustained loss were to be made whole. These people were depositors in banks that had failed. In the New York case, its law being addressed only to employees in hazardous occupations, it might be assumed, as has been said, that such employees were dependent on their wages, and thus in need of indemnifying assistance, or they would not be engaged in such employments. But our law nowhere nor in the remotest degree exercises this amount of selection and discrimination, but bestows its bounty on all. But more important still, I am utterly unable to perceive how a liability fundamentally illegal and void may be metamorphosed into a legal liability by a compulsory law requiring the employer to insure against it. Manifestly the insurance is not even designed for the employer's benefit, since he is subject to additional penalties if he does not insure; it is for the benefit of the employee. The result, therefore, is but to impose another burden on the employer. He may be willing to take the risk of accidental injury. There may to his employees occur no such injury, but he is still obliged to pay out, by way of insurance, money exacted from him because the state had seen fit to threaten him with an illegal liability if he does not insure against that illegal liability. So I say the element of insurance is the importation into the discussion of a false and irrelevant quantity. If the primary liability is legal it requires no appeal to the insurance provisions for its support. If it is not legal, then the argument is simply a declaration that an illegal liability is made legal because it may or must be insured against. This same argument may be applied in complete justification of the destruction of the Lusitania—and, indeed, is advanced by Germany. Germany proposed to destroy the Lusitania. Conceding that this destruction would impose an

illegal loss upon American lives and property, Americans were formally warned of the danger they would incur by traveling or sending goods on that ship. Full opportunity was thus given them not to travel or to ship goods (as in the Haskell case the Oklahoma bank could cease business), or if they traveled or shipped, then by paying a less sum they would receive indemnification against the greater prospective loss of life or property (the insurance of the present law). Self-interest demanded that they do one or the other. If they refrained from traveling or shipping, they were unharmed. If they insured they deliberately made their choice and protected themselves against the primary illegal liability which thus was eliminated, leaving the sole remaining question a private one between insurer and insured. Do such arguments and reasoning satisfy the law in the one case any more than in the other?

The other cases (and their number could be greatly multiplied) to which the prevailing opinion turns for support, are one and all cases where the provisions of the acts in question are optional and elective, and their consideration has no more to do with the legal questions presented in this case than would any other legislative plan of arbitration for the settlement of differences upon the part of those who might choose to adopt its method. The laws of foreign nations legislating under no constitutional restrictions can, of course, throw no light on this discussion, though it may be noted that those laws usually provide for an insurance fund, contribution to which is not made by the employer alone, but by the employee and by the state.

No one may cavil at the declaration of the Washington court that a liability may be created and placed upon an individual without fault on his part. Indeed, the supreme court of the United States so declares (*Chicago etc. Ry. Co.* v. *Zernecke,* 183 U. S. 582, [46 L. Ed. 339, 22 Sup. Ct. Rep. 229]), and so also does the highest court of New York in the Ives case. But neither the supreme court of Washington nor of the United States, has ever announced that such a liability as this may be so created. Addressed as were the remarks of the Washington court to the creation of a liability growing out of the legitimate exercise of the police power, which liability was in the nature of a fixed and limited fee, tax, or toll, its remarks were sound and its citations apposite. Such in-

stances of liability without fault, as in deodands, where the inanimate instrument causing death was in a superstitious age of the common law treated as an evil-doer, taken from the owner and forfeited to the king to be by him given in alms to God; or the personification of a vessel in admiralty where from a conceived necessity to do justice the ship is regarded as a responsible person; such instances also as the liability of the husband for the tort of a wife under the common-law rule that made the two spouses one person and the husband that one, and of the liability of the master for his servant's acts under the maxim, "*qui facit per alium*," to me are utterly without significance in this consideration. All other approved instances of a liability thus created by statute are in fact based on fault directly or inferentially chargeable against him on whom the liability is imposed (It is so and so interpreted in the last Federal Employment Liability Act in 2d Employers Liability cases, 223 U. S. 1, [38 L. R. A. (N. S.) 44, 56 L. Ed. 327, 32 Sup. Ct. Rep. 169]), or grow out of the exercise of the police power, where it is of course fundamental that liability to expense or to loss of property arising from a legitimate exercise of that power affords no ground of objection to the law. I need not dwell upon this, for to my mind convincing analysis and presentation are made in the opinions of Justice Werner and Chief Justice Cullen in the Ives case.

So much, therefore, for the essentials broadly differentiating the Washington law from our own. I have said that in no sense is our law an exercise of the police power. It could not appropriately be described as "revolutionary" if it were, for there is nothing revolutionary about the police power or an exercise of it which is legitimate, as this is held to be. The police power, at least under a constitutional democracy such as ours, being inherent in sovereignty, finds expression in wise, reasonable, and just legislation for the protection and betterment of all or part of the people. The police power needs and has no written charter for its exercise. It exists as an attribute of sovereignty without express constitutional grant. But always, in this country, its expressions have been subject to review by the courts as to their reasonableness. And the basic question always asked and answered as to every police-power law is, "Does the law impose a reasonable regulation for the benefit of the people, reasonable as to the end to be obtained, reasonable as to the means adopted to attain that end"?

·If so, of the incidental expense which the owner of property may have to bear to comply with such regulation he cannot complain. Or does it, under the guise of regulation, impose an unjust and uncalled for restraint on liberty or burden on the owner of property? If so, it is unreasonable, and this unreasonableness renders it obnoxious to the constitutional provisions guaranteeing equal protection, and forbidding confiscation. Of course, if the police power is as declared in the Washington case, quoted with approval in the prevailing opinion,—namely, the "power to govern," then there is an end to discussion. For thus defined it embraces every attribute of sovereignty, and all dissertations on the due or undue exercise of that power in reams of writing by every court from the supreme court of the United States down are but idle vaporings.

So I repeat this law has not the slightest reference to the police power and it does not conduce to clear reasoning so to refer it. If it were referable to the police power no direct constitutional grant would be necessary to sustain it. The constitutional declaration that an employer without fault shall deliver over his property to an injured employee has no more relation to the police power than would a declaration that the legislature may at any time take the property of the prosperous and bestow it on the needy. It is simply the expression of a mandate by the highest state authority. It is the supreme law of this commonwealth. If the legislative enactment before us passed under its authority conforms to the constitutional declaration (as it is held to do) it may be arbitrary, oppressive, confiscatory,—what you please,—but it is not subject to condemnation for any of these reasons. With whatever other constitutional provisions it may conflict, it matters not. This is the last expression of sovereignty. It controls and supersedes all others. Therefore, I think that the protagonists of this constitutional provision were the better reasoners when they caused their views to be embodied in a constitutional enactment, and did not trust them to a mere act of the legislature "referable to the police power."

So important is this consideration that, at the risk of tediousness, I must make my meaning clear. The power absolute over all life and property within a state is sovereignty. The exercise of that power cruelly or humanely, justly or unjustly, was vested in the chief, the despot, the

autocrat, the tyrant, the dictator. The subject who would not submit fled, or revolted, or died. This is the concept, the foundation of authority upon which rests the present day state. In a constitutional democracy such as ours, the only difference is that the exercise of that power has been transferred from the autocrat to the people, who express their will in an ordained way. Under a determination to check themselves from the consequences of their own ill-timed passionate outbursts, to secure the minority from unjust assaults, to give equality and humanity to their edicts, they have declared what they will not do, that is to say, what they will not permit their agent, the legislature, to do in their name. This is the meaning and the prepotent significance of a written constitution. It is the curb which the sovereign has put upon his own unbridled powers. And so we find many restrictions in our constitutions which are most informing to the reflective mind. Cruel and unusual punishments are forbidden. Who, to-day, desires to inflict such punishments? Nevertheless, it is deemed necessary still to say that the sovereign, the people, will not inflict them, since sometime in the heat of passion it may be tempted to do so. Let me conclude this with a brief quotation which aptly presents the matter:

"When the people finally came into power, and free citizenship began to supersede hereditary royalty, the people were informed that this 'sovereignty' was theirs; this glorious prerogative, this 'absolute, indivisible, and inalienable power' *to do what they liked.* Who, falling heir to such a splendid heritage of license, would look to see if it were not, after all, only a tarnished relic of vanished past?

"And so, 'sovereignty' has come down to us, and its possession is claimed by us in moments of need, as a charter of exemption from the Moral Law affording us *carte blanche* to start out—if we only do it as a nation, and by a formal act of government—upon any expedition of plunder and destruction that our 'interest' may prompt us to undertake."

(David Jayne Hill—North American Review, June, 1915.)

It does not clarify the situation, but "darkeneth council," to discuss such a law as this as laying down a "rule of conduct." Lexicographers and jurists struggling to pack the meaning of a very broad and abstruse subject within the box of a few confining words, have universally failed. The definition of law as a rule of conduct is one of these failures.

Our law defines and punishes murder. Only inferentially at the most can this law be said to prescribe a rule of conduct. It warns the intending perpetrator of a murder that he will be punished, and only by inference suggests that his "rule of conduct" should be to abstain from the crime. So here our law says that A's property shall be given to B if he employs B. The only "rule of conduct" here laid down, and that inferentially, is that it would be better for A not to employ B.

So, I repeat, (assuming for the moment that the law here under review is fairly within the limits of the constitutional grant—a question for later consideration), it need not be referred and is not referable to the police power. It is an expression of the sovereign will and whatever be its terms, it is the highest law of the state of California, and as such, so far as our own constitutional limitations are concerned, valid beyond parley or peradventure.

But there is yet one higher law which it must not violate and that is the constitution of the United States. Whether or not it does so, necessitates further consideration of the meaning of the act itself. Broadly, it says to every employer, "You shall pay a stated sum of money to every employee who is injured while in your employ, though he be injured through no fault of your own." Why the sovereign people should have said this is perhaps an idle question, since it has said it and its word is final. But as the prevailing opinion finds justification for a fiat which it concedes to be revolutionary, something may be permitted in reply.

The law says that for no wrong, for no fault even, the citizen shall give his property to a man injured by the latter's own neglect. Why? 'In reason only because he has employed that man. But contracts of employment are not wrong. They are not alone desirable, they are absolutely necessary to the welfare of the state. Why should the employer be thus penalized? Answer is made in the prevailing opinion that the law affects only future employments. This would appear to be based upon the reasoning of the supreme court of the United States in the Oklahoma Bank case (*Noble Bank* v. *Haskell*, 219, U. S. 580, [55 L. Ed. 341, 31 Sup. Ct. Rep. 299]), to the effect that if a bank did not like the law taking from it a part of its deposits for the benefit of strangers, it could cease business in Oklahoma. But shall this law find support in a similar declaration that, not liking

it, no one need employ another? Such an answer would lack something of complete satisfaction. American citizenship has been bred in the belief that to each man was given the utmost liberty of contract, of initiative, of action, so long as he did not trespass upon the equal rights of his fellows. It has been told and taught that a man was responsible for his wrongs, civilly or criminally, or both; but it has also been told and taught that where one had committed no wrong he walked scatheless and unharmed in person and property.

Again it is said that it is thought expedient that the loss by injuries to workmen should be borne by the industries and not by the men. But this is only a euphemism which obscures the facts and darkens reason. It is like other happy catch-phrases that deceive the mind by pleasing the ear. We have many such. "Putting the rights of property before the rights of men," is one—as though property apart from those of its human owner, ever did or could have any rights. So that the rights of property are absolutely the rights of men.

A fee or toll, as in the Washington case, based on the magnitude of the business, or, more equitably still, on its profits, may fairly be said to be a charge placed on the industry, but here it is not the industry which bears any burden. It is the employer who pays without regard to his industry. The payments exacted may sweep away from him not only his industry, but all else as well. It may leave him penniless. It may leave him in still worse plight, compelled to labor for years to pay money to those he has never injured, to those against whom his only offense is that he gave them honest employment at an honest wage. Is this making the industry pay? Does not the state value initiative and ability, thrift, and economy? One man working at a given craft with five others, by the exercise of these qualities, saves enough to become their employer. They are fairly treated, and liberally paid. He works with them. By an explosion, due to the negligence of no one, all are killed. If the employer lives he is ruined, and his future lifework must be devoted to paying those he had not wronged. If he dies with them, from his estate must come the death awards to the others, even if it leave his own family destitute. Nor is this all. For every injury occurring through the neglect or intent of a stranger the employer is equally responsible. Besides his own uncompensated loss he will be mulct to pay for the crimes of the mur-

derer and anarchist, as in the awful tragedy of the Los Angeles Times explosion; or for the act of God as in *State* v. *District Court*, 129 Minn. 502, [153 N. W. 119], where the employer was held liable for the death of a teamster killed by a stroke of lightning. Truly it is a bemusing euphemism that talks of the "industry" bearing such burdens which are not even based or proportioned on the magnitude of the industry, its profits, the wealth of the owner of it, or the needs of the persons benefited.

Again it is implied, if not said, that this law is designed to relieve the "workman" from the loss to him resulting from his injuries. Much, indeed, could be written of the desirability, the humanity, of affording speedy relief to the toiler dependent upon his own exertions for the support of himself and his family. I, for one, earnestly favor and advocate the passage of a proper law for such a purpose. But, as touching this law, it is too plain for words that it has no such humane origin or purpose. It is not the needy "workman" who alone is to be benefited by it. With a generosity so often displayed in giving away that which is not our own, it donates the employer's property to every employee regardless of his position or his needs. The wealthiest of attorneys, under annual retainer, breaking his leg while hurrying to court to argue a time demurrer for his client, comes under its beneficent provisions. Every high placed and high salaried official in railroad, bank, manufactory, mercantile house, or mine, is equally the recipient of this law's bounty. Nor is this all. These men, one would say, of all men in the country, are best capable of looking out for their own interests. But this law says not. They are denied the right of contract,—the right to waive the provisions of this law. It insists, in short, that they shall take their employer's money.

The mere fact that a man is an employee does not commend him to the especial care of the state any more than does the mere fact that he is an employer so commend him. All men stand alike in the regard of the state, equally share its protection, and should in proportion to their wealth equally be called on to bear its burdens. That is the meaning of taxation. It is the circumstance of dependency arising from injury or death that alone appeals to the consideration of the state, and justifies it in setting in motion the machinery of its police power. This I think cannot be questioned, and being

so it follows inevitably that this police power cannot be exercised except to relieve from and forefend against such dependency. But this in turn inexorably demands a segregation of employees into three classes; those dependent on their earnings; the intermediate class who are in part dependent on their earnings; and the third, those who are not dependent on them; and in the case of injury or death an inquiry into the actual dependency on his wages of those who constitute the family of the deceased. Upon two of these classes the police power may act. An extension of its benefits to the third is an unjustified donation to it of others property. So I say for its failure to classify, this law is not referable to the police power; and, unless, without the slightest warrant or authority in fact or in law, this court erects the conclusive presumption, that every employee and every member of his family is so dependent, it cannot be held valid.

It seems to me, therefore, to be beyond the limits of reason to erect a "theory" that this law is passed for the benefit of the "workman," and even if the theory is tenable, then I say the means are so grotesquely disproportionate to the end as to be ridiculous if they were not so destructive. It is using a thousand horse-power engine to lift a pin. It is cutting down a forest to secure a bird's nest.

But if all this be put aside, if it be said, as does the prevailing opinion, that this law is framed upon the theory of benefiting the workman by taking the property of his employer and giving it to him whenever he is injured (for this, stripped of the fine raiment of covining phrases is exactly what this law does), it still is to be determined whether this theory is worked out in consonance with the constitution of the United States.

As the decision in this case will doubtless pass under the scrutiny of the supreme court of the United States, it is not unnatural that this law should have been placed in the sanctuary of the police power. I have said, and endeavored to show, that it is not referable to that power. But, conceding that it be, I have no hesitation in entering that field of argument with the declaration that as an exercise of the police power, it is utterly unreasonable, unjust, and oppressive. I recognize in saying this that the supreme court of the United States has justly shown the utmost liberality in sustaining all state and federal laws which by any tenable

CLXX Cal.—46

process of reasoning could be upheld as legitimate exercises of that power. But this law, I insist, transcends anything that the history of the country has known, and unless the definition of the police power be broadened by the supreme court of the United States to the extent of saying that when exercised under the authority of a state constitutional grant its expression is not subject to that court's review on the ground of unreasonableness, oppression, or confiscation, that such an expression is a declaration of the will of the sovereign, who may do as he or it pleases, then I repeat that, treating this law as an exercise of the police power, it is violative of the fourteenth amendment of the constitution of the United States, and therefore void.

Many of the grounds of this conviction have hereinbefore been expressed. It may not be amiss, however, to particularize further. An act clearly and unmistakably designed to safeguard or to better the condition of the people is indisputably within the purview of the police power. This act may be, for the purposes of the discussion to follow, conceded to be so designed. This, however, is but the first step toward the goal. It is the determination of only the first factor in the solution of the problem. It is equally important that the means prescribed to attain the result shall be as reasonable and as equitable, as fair and as nonoppressive, as the nature of the end to be achieved will permit. And it is here again that I think the reasoning of the prevailing opinion goes astray. It seems to be argued that because the end is a consummation devoutly to be wished, the means are negligible and may be either brushed aside or treated with the slight deference which their inconsequence demands. This is not a new doctrine. It has been advanced in the past. It is urged to-day by nations warring for existence, but it never has had the sanction of the law. Nor does it mean that one condemns the purpose of a law because he withholds approval of the method of the law. I earnestly advocate the payment of Paul, but as earnestly condemn the robbing of Peter to accomplish this end. And this is the precise situation presented by this law. The state, it is quite true, is profoundly interested in the welfare of all its people. There are especial considerations, economic, and humane, which merit and demand legislation on behalf of dependent wage earners. As a part of such legislation, laws to relieve their necessities

and the necessities of their dependents when affliction and inability to labor overtake them, are commendable and just. But it is never to be forgotten that it is the state and not any individual member of the body politic to whom the welfare of those citizens is intrusted, who may make provision for that welfare, and indeed whose duty it is to make provision for that welfare. The mere circumstance that a contractual relationship exists between the employer and the employee forms absolutely no logical basis for the declaration in fact or in law that the employer must support that employee and take upon himself a duty exclusively belonging to the state. No parallelism exists between this transitory relationship created by contract and the all-important duties, rights, and obligations springing out of the domestic relationship of the family. The employer is in no true sense more interested in the welfare of his employee and chargeable with maintaining that welfare (aside of course from the familiar duties of providing safe appliances, comfortable conditions, and the like) than is any other citizen of the commonwealth. And herein lies the unreason and oppression of this law. It places upon the employer, to the peril of his welfare and the loss of all his property, the performance of a duty resting upon the state itself, and so upon every citizen of the state. The argument made in support of this law is that heretofore the employee had to bear the burden of the loss of an injury due to his own neglect, without fault on the part of the employer. The state has seen fit ''to shift this burden of loss,'' to ''transfer this burden'' from the employee to the employer, and somehow it seems to be believed that by juggling with these phrases it is established that the transfer may be legally made. This argument finds favor with the majority of this court. It is well answered, I think, in the language of Chief Justice Cullen in the Ives case: ''But I do deny that a person employed in a lawful occupation, the effects of which are confined to his own premises, can be made to indemnify another for injury received in the work unless he has been in some respect at fault. I am not impressed with the argument that 'the common law imposed upon the employee entire responsibility for injuries arising out of the necessary risks or dangers of the employment. The statute before us merely shifts such liability upon the employer.' It is the physical law of nature, not of govern-

ment, that imposes upon one meeting with an injury, the suffering occasioned thereby. Human law cannot change that. All it can do is to require pecuniary indemnity to the party injured, and I know of no principle on which one can be compelled to indemnify another for loss unless it is based upon contractual relation or fault. It might as well be argued in support of a law requiring a man to pay his neighbor's debts, that the common law requires each man to pay his own debts, and the statute in question was a mere modification of the common law so as to require each to pay his neighbor's debts.'' It is certainly a gracious phrase ''transferring a burden,'' when applied to a law which donates to an employee injured by his own negligence the property of his employer, whose sole fault lay in giving him work. To my mind, to declare that this law does no violence to the constitution of the United States, is the exact equivalent of saying that the constitution of the United States does not protect its citizens from the spoliation of their goods and the confiscation of their properties. The maintenance of hospitals for the needy and sick is most commendable, comes well within the purview of the police power; the bankers, the lawyers, may be regarded as forehanded and prosperous men. I can see no reason why, if this law be upheld, the legislature should not declare that each banker and each lawyer should give a tithe of his annual income directly to these worthy and useful institutions. Nay more, I cannot see what legal objection could be found to a law which provided for a general reapportionment of wealth, to the direct end of giving to each person an equal share of this world's goods, for poverty is deplorable in a state as well as injurious to the state and its pauper citizens, and the state may take all legitimate means to relieve and abolish poverty. The tremendous disparity in wealth between our very rich and our very poor is most regrettable and should be remedied if possible. The end therefore may be said to be desirable, and as opposed to the consummation of that end the means are nothing. It may be very well for the state to enter the large field of socialistic paternalism. But let us frankly recognize that that is precisely what such legislation does, and not seek to disguise such laws as police measures.

Still further it is said in the prevailing opinion that the law, being prospective, disturbs no vested right. It disturbs

no vested right only upon the theory that no man will here-
after employ another. But I have heretofore said that I do
not think that the declaration of the Oklahoma case will
ever be given this purport. It is also said that the law pro-
vides for a notice and a hearing as to liabilities arising under
it. But when a law says that A shall pay one thousand dol-
lars to B if A has employed B and B has suffered injury
through no fault of the employer, it needs, I think, no argu-
ment to show that under such a prefixed liability based upon
no wrong, the requirements of due process of law and of the
equal protection of the law are not observed simply because
it is open to the employer to show that he did not employ B
or that B was not in fact injured. Finally, it is said that it
is not supposed that the reasoning which, applied to this law,
results in a declaration that it is valid, would be held to apply
to cases of confiscation and spoliation. I challenge this
statement, for to me it appears unanswerable that if the rea-
soning of the prevailing opinion be sound, then any and every
law of spoliation or confiscation, if constructed upon the
framework of this, and designed for an end held desirable,
must be declared valid. Upon this phase of the case, there-
fore, the conviction is profoundly impressed upon me that
this law, though clearly sanctioned by the constitution of·this
state, is violative of the fourteenth amendment of the con-
stitution of the United States, and is therefore void.

Let me give a specific instance of this. Let me create a law
under the sanction of the prevailing opinion. The welfare of
the employee is of especial concern to the state. It is to the
interest of the state that employees should be indemnified
against loss occasioned by their injuries. This, of course, is
indisputable. The state has performed a part of its duty
to employees by providing that for injuries suffered during
the hours of employment, their employers shall indemnify
them. But it has not performed all of its duty nor exhausted
all of its powers. So far as the state and the employee are con-
cerned it matters not when or where the latter is injured. It
is not a question of time, place, or circumstances, but of conse-
quence. It is the consequency of injury to the employee sup-
posedly dependent on wages against which it is just and is the
duty of the state to protect him. An employee injured out of
his hours of labor suffers the same consequences as though he
were injured during the progress of his work, and the state

sustains the same loss. So far, under the law, the state and employee are only protected during the hours of employment. It is equally desirable, since the evil consequences are the same, that they ·be protected during the hours of leisure. Therefore the legislature enacts that any person in the class defined as employees who in his hours of leisure is injured while on the property of another shall be indemnified by the owner of the property. If the injury occur on a public highway or sidewalk the owner of the abutting property shall be liable for such indemnification. But the owners of large business blocks in cities are unusually careful to keep the sidewalks and approaches to their buildings in good condition to attract tenants, and the tenants observe the same precautions to secure patronage. Therefore the risk of injury is much less in and about such premises and the owners of such properties are exempted from the operation of this law. The person charged with liability shall be entitled to notice and a hearing on the questions: 1 of his ownership of the property; 2 of the injury to the claimant, its nature and extent; 3 of the place of injury, whether or not it occurred on property to which the "burden has been shifted." Here, then, is a law whose purpose is laudable, whose object—the welfare of the workman—is peculiarly within the domain of the police power and of a beneficent exercise of that power. In the language of the prevailing opinion, "It is simply an exercise by the state of its governmental power to pass laws regulating the ordinary private rights of persons and property. The law in question is of this character. It does not affect past transactions or previously acquired rights of person or property. It provides for a notice and a hearing as to liabilities arising under it, and it bears alike upon all affected by its provisions."

The exemption of a class of rich property owners from liability is justified upon precisely the same grounds as those declared sufficient in the prevailing opinion to exempt the farmer and viticulturist; the property can better afford to stand the loss than the employee, so the "burden is transferred," but it is placed not on the owner but on his property. He can make himself whole by increasing his rents or insuring. The logic of the reasoning which justifies the imposition of the liability upon the employer without fault for an injury occuring during the hours of employment ap-

plies with equal force and finality to the owner of the property upon which the employee happens to be in his hours of leisure.

And, finally, there is sickness. The earning power of an employee is as much impaired by sickness as by injury. The case of sickness has not been provided for. Employees deposit in savings banks. It is to the interest of savings banks that employees should deposit as much as possible. Banks are a proper subject of regulation, as declared in the Haskell case. Therefore there should be another law providing that savings banks shall pay to every employee who is sick the amount of his wages while that sickness continues.

In these supposititious cases I have not advanced beyond the reasoning of the prevailing opinion one step. I have adopted that reasoning without amendment and applied it without alteration to other laws, and it will be vividly illuminating to have it shown upon what ground (the present law being held valid) the others could be condemned.

Other questions of narrower import but not without consequence demand consideration. They may be thus expressed: Does this law, passed under the sanction of the constitution of this state, do violence to the constitutional grant of power to which it owes its existence, or to other constitutional provisions not directly or by necessary implication repealed by this later constitutional provision?

First treating this law as drawing its validity from the constitutional grant, to my mind it is clear that the legislature has violated the powers which the constitution has conferred upon it. It is not questioned, indeed it is declared in the prevailing opinion, and it is of course true, that this constitutional amendment is a revolutionary departure from all existing concepts of the duties and obligations which may be imposed upon any class of citizens. This is so true that it is scarcely overstating it to say that the constitutional grant does violence to what may be conceived to be the natural right of all persons. There is here a special reason, therefore, for construing this constitutional enactment as it is written. As it is written, it declares that the legislature may create and enforce a liability on the part of *all* employers. The legislature has seen fit to create and enforce a liability against some but not all. The tremendous change worked by the constitution in the policy and laws of the state lies in this, that what

the constitution has declared is that the legislature may create a new liability, imposing it upon all employers—upon *all* employers, because the very purpose of the declaration was to protect and benefit *all* employees. It has announced a most radical change. It has overthrown the principles and precepts of the common law and of every former statutory enactment. It has done this as a matter of state wide policy. It has so declared in terms. It has authorized the legislature to give effect to its policy. What is that policy? This and this only: that hereafter *all* employers without recourse to the courts, shall compensate *all* employees who may be injured, during their hours of employment. Such a change in policy, radical as it is, is at least understandable and equitable to the extent that all in the employer class share alike a common and equal burden. Had the constitution ever designed that the legislature could exercise a discretion in the matter, manifestly it would have said so by the simple addition of the words "or any" following "all." The careful phraseology of the whole amendment establishes that it says what it means and means what it says. Regardless of the provision of the constitution that permissive words are to be considered as mandatory, and therefore regardless of the question as to whether or not the legislature must act under this provision, plain it is that if it does act under it its power of action must embrace all employers. I know of no rule of construction, and none is cited, which countenances any other conclusion. "All taxes must be uniform," does not mean that some may be uniform. "All men are equal before the law," does not mean that some are equal before the law. "All laws of a general nature shall have a uniform operation," does not mean that some only of those laws may have a uniform operation. "All persons shall be bailable by sufficient sureties," does not mean that a select few alone are bailable. "All men are by nature free and independent," does not mean that a designated few are; and so to the end of the chapter.

Again it is conceded that the constitution imposes a new and revolutionary liability. It will not be extended by implication, therefore, beyond its express terms. Those terms cast upon the employer the obligation to give his property to his employee if the latter be injured. It nowhere declares or intimates that the employer shall be liable to the heirs or legatees or dependents of the employee in case of his death.

The right of action to a person injured is so totally different from the right of action to his heirs for his death, that the difference does not need exposition. The constitution has said only that the employee shall be indemnified for his injuries; the statute says that his dependents shall be compensated for his death. Adversion is made to this, not as being directly involved in the present hearing, but because, along with the exemption of the favored classes, it illustrates the construction which I think the legislature mistakenly put on this constitutional grant of power,—which creating a liability theretofore unheard of in the whole history of our jurisprudence from the remotest antiquity of the common law until to-day, demanded under every tenet and canon of construction that the power be not exercised beyond the declared limits of the grant.

But dropping out of consideration these radical constitutional defects in the law, and treating it as a law passed without reference to this constitutional grant, and bottomed on the police power, still the ineluctable result is the condemnation of the statute. I am, of course, not unmindful of the vast number of decisions, indeed they confront one from every quarter, touching the wide discretion of the legislature in matters of classification. Nor yet am I unmindful of the lengths to which the courts have gone in sustaining dubious classifications. But while it is true that if there are good grounds for the classification, a law is not void because it does not include every other class needing similar protection; nevertheless, it is equally true that if there be not good grounds for the classification, it is void unless it includes all who are entitled to its benefits, or should be placed under its liabilities. Failing this, in the one case, a citizen is deprived of a benefit conferred upon his fellows; in the other, he escapes an obligation imposed upon his fellows. It needs no demonstration as to this law to show that the classification here made is not, as in the Washington case and in the New York case, based upon the hazardous or extra hazardous nature of the employment. I think it would be trifling to attempt to argue that the hazards of the exempted occupations are not as great as, and in many instances vastly greater than, in the employments and industries coming under the protection and benefit of this law. Is the handling of modern machinery upon a farm any less dangerous than the handling of like machinery elsewhere? Is the employee engaged in plowing,

harvesting, and care of his team upon a farm incurring less hazard than the same teamster or stableman in a town? Is the answering of a telephone or the selling of shoes more hazardous than the dangers attending the hired man of the farmer, the milker or driver of the dairyman, the winemaker or the viticulurist? But there is no need for more examples, when the multitude of them floods every mind at first thought. What are the consequences of this classification? The state being interested in the indemnification of employees and the creation and substitution of a new liability upon their employers, by what authority shall the legislature say that it will refuse the benefits of this law to innumerable employees as fully entitled to its benefits as are those who are included therein? Upon the one hand, if the law be a beneficial law to the employer, as is argued, why should the farmer, dairyman, viticulturist be debarred from its privileges and benefits? . Upon the other hand, if the law be a detriment to the employer, why should they be exempted from its operation? If a classification such as this is to be sustained, then all the constitutional provisions against special and class legislation may be "cast as rubbish to the void."

Approving in principle this legislation, as I have said I do, condemning as unconstitutional the means adopted to effectuate it, as I have expressed the conviction must be done, the natural query arises as to what legal form such legislation may take. The answer is perhaps sufficiently indicated by what has already been said. But specifically answering, I say it may take, within reasonable bounds, the form of tolls upon industry, the fund thus raised to be devoted to the indicated purposes, as was done under the Washington law. Where this method is not sufficient nor sufficiently efficacious, then as the wisdom, the propriety, the duty of aiding the injured or disabled or crippled or dependent employee is a governmental duty and not an individual duty, it should be performed as a governmental function by a tax to which every person, as a member of the body politic, should contribute in proportion to his wealth.

The importance of these considerations must be the justification for this extended exposition of my views.

Rehearing denied.

At the time of the denial of the rehearing, on September 2, 1915, Shaw, J., filed the following opinion:

SHAW, J.,—The petition for rehearing filed herein relates only to the facts concerning the injury in the particular case, and not to the validity of the law.    These facts are sufficiently treated in the opinion and I think they require no further consideration.

Further reflection upon this case since our decision was rendered has led me to doubt the soundness of one of the propositions treated in the opinion.    I refer to that part of the opinion affirming the validity of the act so far as it declares that the employer who is himself without fault may be compelled to compensate his employee for an accidental personal injury which such employee has inflicted upon himself solely by his own negligence.    I take this occasion to state the reasons for my doubts.

It is proper to say that the case involved in this proceeding was not of this class and hence that the question does not directly arise in the case, and further that, in my opinion, even if it be decided that the law is invalid in this respect, it would not affect its validity with respect to accidental injuries of other classes.    For these reasons a rehearing herein is unnecessary.    This particular case is properly decided because the injury involved falls within the classes with regard to which I believe the law to be valid.    But the principle declared in support of its validity as to the particular class of cases just mentioned is so revolutionary and so destructive of what has heretofore been considered the inalienable right of citizens that I do not think it should be allowed to become a precedent, even if only a *dictum,* without further consideration.

I concede that it may be a matter of public concern and a duty of the state to relieve employees who, in the course of their employment, may be injured solely by their own fault and not by the contributing negligence of a fellow-servant, or the employer, or because of any danger inherent in the business itself or in the place in which it was carried on.    This, in fact, is the only justification and sole authority for an enactment by the state of a law to provide relief for such injuries. It would be in the nature of a public charity, and, consequently, the money used in giving such relief would be money applied to a public purpose or use.    But it does not follow that the state has the right or the leglislature the power to do this by putting the entire burden of supplying the money in each case

as it arises, upon the person who happens to be the employer of the injured person, and who, in the case stated, is no more blameworthy or instrumental in the infliction of the injury than any other citizen.

In plain language and stripped of all obscuring verbiage, this is nothing else than the taking of the employer's property from him without compensation, without consideration and without process of law, and giving it to another for his private use.

There are strong reasons for holding this to be a clear violation of the right to acquire and possess property which our state constitution declares to be inalienable. This declaration is but a reiteration of one of the fundamental doctrines upon which all free government is founded, the doctrine that the right to acquire, possess, and enjoy property inheres by nature in every human being, and is independent of constitutions and constitutional guaranties, that it is a right which cannot be taken away from any person by any declaration or rightful rule of the majority, except in the exercise of the police power. This doctrine is self evident and is sanctioned by the highest authority. Mr. Cooley in his work on Constitutional Limitations says: "The bill of rights in our American constitutions forbids that parties shall be deprived of property except by the law of the land; but if the prohibition had been omitted, a legislative enactment to pass one's property over to another would nevertheless be void." And he quotes the following from the opinion of Justice Nelson in *People* v. *Morris* (13 Wend. (N. Y.) 328) : "It is now considered an universal and fundamental proposition in every well regulated government, whether embodied in a constitutional form or not, that private property cannot be taken for strictly private purposes at all, nor for public use, without compensation." (Cooley on Constitutional Limitations, p. 244.) And on page 507, after stating that private property may be taken for public use, under the powers of taxation and eminent domain, he says further, "But there is no rule or principle known to our system under which private property can be taken from one person and transferred to another, for the private use and benefit of such other person, whether by general law or by special enactment. The purpose must be public and must have reference to the needs or convenience of the public, and no reason of general public policy will be sufficient to validate other trans-

fers when they concern existing vested rights.'' (See, also, *Wilkinson* v. *Leland,* 27 U. S. (2 Pet.) 657, [7 L. Ed. 542]*; Terrett* v. *Taylor,* 13 U. S. (9 Cranch), 50, [3 L. Ed. 650]; *Bowman* v. *Middleton,* 1 Bay (S. C.) 252; Ervine's Appeal, 16 Pa. St. 263, [55 Am. Dec. 499]; *State* v. *Neff,* 52 Ohio St. 401, [28 L. R. A. 409, 40 N. E. 720]. Many other cases to the same effect could be cited.)

It is a well established principle of constitutional law that all property is held subject to the police power and that in its legitimate exercise, property may be taken from the owner or destroyed, without compensation to him for its value. This is a part of the price which every person pays for the protection afforded to him, in his person and property, by organized society, and the consideration therefor to him consists of that protection and in his share of the public benefit presumed to follow. But there are persuasive reasons and high authority for the doctrine that one of the conditions and limitations of this power is that it cannot be exercised upon any individual unless he or his property is or may become somehow offensive or detrimental to society, that is, to the general welfare or public interest. By this is meant that he must be personally at fault in some way, or that his property must be, either of itself and naturally, or by reason of its actual or potential use, injurious or inimical to the general welfare. It would seem that the community has no moral right to deprive an innocent person of property belonging to him if neither by its use, its nature, or the use which is or may be made of it by others, it is or can be harmful to others or to the general welfare. (Freund on Police Power, sec. 511.) The very foundation of the conception of police power is that it must exist and can only exist to protect the public from evil, hurt, or mischief, and to promote the public interest or welfare or the public convenience. It may well be said, therefore, that it can be exerted upon the individual only when he, or his property, causes, or is likely to cause, evil hurt or mischief to the public, or to the public interest, or interferes with the public welfare or convenience. No one would seriously dispute the proposition that the private property of a person cannot be taken from him, under the police power, solely because its possession by the public, or by another individual, would be a greater public benefit than its possession by the original owner.

There are decisions which appear to indicate that this is the fundamental basis for the exercise of the police power. A few passages may be quoted. In *Commonwealth* v. *Tewksbury,* 11 Metc. (52 Mass.) 55, the court said, "All property is acquired and held under the tacit condition that it shall not be so used as to injure the equal rights of others, or to destroy or greatly impair the public rights and interests of the community; under the maxim of the common law *sic utere tuo ut alienum non laedas.* In *Mugler* v. *Kansas,* 123 U. S. 623, [31 L. Ed. 205, 8 Sup. Ct. Rep. 273], the court said, "All property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community"; and further. "The exercise of the police power by the destruction of property which is in itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use or depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other *unoffending property is taken away from an innocent owner.*" In *Fertilizer's Co.* v. *Hyde Park,* 97 U. S. 667, [24 L. Ed. 1036], the court said that the police power "rests upon the fundamental principle that every one shall so use his own property as not to wrong or injure another." Many similar declarations could be quoted, all of which declare or clearly imply that property cannot be taken from a person, under the police power, where such person is innocent of wrong and his property is not and cannot become harmful to the public interest or welfare.

It would follow from these principles that in the case of the blameless employer here referred to there is no foundation for the exercise of the police power upon him. He has done no wrong. His property is neither harmful to other persons nor to the public interests or welfare. There is, in truth, no pretense that it is. In such a case the state takes the money from the employer and passes it over to his employee not because of his use of it, or of its nature, or of any act of his, but solely because the state conceives it to be its own duty to relieve the misfortune of the employee, believes that such relief will promote the general welfare, and that money is required for that public purpose. This may be a sufficient reason for the raising of funds by the state by some lawful mode of taxation, bearing alike upon all concerned therein, out of which to compensate

this class of injured persons. But it may well be doubted if it furnishes any justification or reason whatever, for a law of the state compelling the innocent employer to bear the whole of the state's burden and to perform the state's duty by paying the entire compensation himself.

In concurring in the decision of the court herein I said that, because of the insurance scheme instituted by this law, the burden of this relief would be ultimately distributed evenly over all employers in the industries affected by the law and thereby placed equally upon those who ought to bear it; thus being, in practical operation, in the nature of a tax, or impost, similar in effect to that of the state of Washington; and that because of this feature the law might be deemed a reasonable exercise of police power. For this reason alone I concurred in the opinion.

The difficulty with this solution of the question, aside from the fact that it seems, unwarrantably, to combine the taxing power and the police power, is that, if the propositions I have heretofore stated are correct, the law, so far as its application to this class of accidental injuries is concerned, is not an exercise of the police power at all. If, as above indicated, the law in this respect is an attempt to take private property from the owner for the private use of another person, under the claim that the public welfare will be promoted by such transfer, it would be a taking for a public purpose without lawful excuse or right and without compensation. Consequently, it would not be justified, or made lawful, by the fact that some provision is made whereby the owner may be partially reimbursed. As an exercise of the power of taxation to raise funds for a public purpose, it is condemned by its admitted inequality and lack of uniformity. Furthermore, it does not purport to be a taxing act as does the Washington law. It is not a lawful exercise of the power of eminent domain, for the owner is compelled to pass his money over directly to the private use of another, and it is difficult to see that he is properly compensated therefor by the state or by the person who received it, or at all. Even the opportunity to obtain such partial reimbursement as the law furnishes by means of the insurance scheme is not made absolutely secure, but depends on the soundness of the plan and its general voluntary adoption, or the pleasure of future legislatures in keeping up the insurance funds, if it should prove inadequate through lack of patronage

or from other causes. The power of eminent domain is coupled with the conditions that the compensation for the property taken must be full, not partial, and that it must be actually made. A mere opportunity to buy compensation, or to contract for it, will not meet the conditions.

So far as it provides for compensation from employers to their employees who are accidently injured in the course of their employment, where the injury is caused wholly or partly by the negligence of the employer or of a fellow-servant, or from dangers incidental to the business or arising out of the place provided by the employer for the doing of the work, I believe the law is within the legitimate and constitutional powers of the legislature and of the state, and I concur in the main opinion so far as it applies to these classes of cases. But with respect to that much smaller class of cases, where the negligence of the employee himself is the sole cause of his injury, and the negligence of the employer, or of fellow-servants, or the dangers of the business, or of the place in which it is carried on, in no manner contributes thereto, the law appears to me to be a provision for carrying out a public charity the burden of which in each case is placed wholly upon a single person who is without fault.

I can conceive of no reason why the law may not operate successfully in all other cases. The question I have discussed will not arise except in cases which come within the description I have given of an injury occurring solely from the negligence of the employee himself. Inasmuch as its application to this class of cases was not directly involved in the present case, I think it would have been better to have refrained from expressing any opinion regarding it until the point is directly presented. I express these views now because, when such case does arise, I wish to be free to consider the question anew, and because if the law, in this particular, does violate inalienable human rights, this court has no duty more important than that of declaring such rights and preserving them from legislative invasion.