## KANSAS CITY FIBRE BOX CO. et al. v. CONNELL.

(Circuit Court of Appeals, Eighth Circuit. March 25, 1925.)

No. 6759.

1. **Courts** ⚖️366(23)—**State Supreme Court decisions, construing state statutes, binding on federal courts.**

Decisions of the Supreme Court of Kansas, construing state Workmen's Compensation Act, are binding on the federal courts.

2. **Master and servant** ⚖️373 — **Injury by pranks of youthful coworkers is one "arising out of employment."**

Under Kansas Workmen's Compensation Act, employer, who places boys as coworkers with others in hazardous employment, is charged with what may happen from their curiosity, zeal, vigor, and boyishness, and such risk is reasonably incident to employment, and if injuries result through curiosity or pranks, such as boys of immature age are wont to indulge in, injury is one "arising out of employment."

3. **Master and servant** ⚖️373 — **Injuries by sportive acts of fellow workmen independently of employment do not "arise out of employment."**

Injuries caused by some sportive act of fellow workmen, independently of and disconnected from performance of any duty, do not "arise out of employment," within workmen's compensation statutes.

4. **Master and servant** ⚖️373—**Injury to employé at work, due to scuffle with fellow employé, held one "arising out of employment."**

Evidence that employé, while operating machine, was interfered with by play of fellow employé, and in resisting same, without ceasing work, scuffle took place, as result of which claimant's hand became engaged in knives of machine, *held* to show injury was one "arising out of employment," and hence compensable under Kansas Workmen's Compensation Act.

Stone, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Action by Raymond Connell against the Kansas City Fibre Box Company and others, removed from the state court. Judgment for plaintiff on directed verdict, and defendants brings error. Affirmed.

J. K. Cubbison, of Kansas City, Mo. (William G. Holt, of Kansas City, Mo., on the brief), for plaintiffs in error.

T. F. Railsback, of Kansas City, Kan. (J. H. Brady, of Kansas City, Kan., on the brief), for defendant in error.

Before STONE and KENYON, Circuit Judges, and SCOTT, District Judge.

KENYON, Circuit Judge. This action is one brought by Raymond Connell against plaintiffs in error under the Workmen's Compensation Act of Kansas (Laws 1917, c. 226), to recover for personal injuries occurring March 21, 1923, while Connell was working in the manufacturing plant of plaintiffs in error on what is known as a corner cutting machine, being a device for trimming and cutting corners of boxes by means of sharp knives operated by power. His left hand became involved in said machine, and the second, third, and fourth fingers were cut off. It was claimed in the petition that he was entitled to compensation in the sum of $3,400 under the terms of said Workmen's Compensation Act. The case was commenced in the district court of Wyandotte county, Kan., and by defendant removed to the United States District Court for the District of Kansas. At the conclusion of the testimony the District Court directed a verdict for plaintiff in the sum of $585, which the court computed as the amount due under the act. The case is here on writ of error, based upon a number of assignments. However, only one question is involved on this writ, and that is: Did the injury to Raymond Connell result "by accident arising out of and in the course of his employment"? The question is further narrowed by the undisputed situation that the injury was the result of an accident and that it was "in the course of employment." It is the position of plaintiff in error that the injury was the result of sportive acts on the part of defendant in error and his coworker, and hence did not arise out of the employment.

The provision of the Workmen's Compensation Act of Kansas upon which this claim is based is as follows:

*"The Obligation.* If in any employment to which this act applies, personal injury by accident arising out of and in the course of employment is caused to a workman, his employer shall, subject as hereinafter mentioned, be liable to pay compensation to the workmen in accordance with this act. Save as herein provided no such employer shall be liable for any injury for which compensation is recoverable under this act." Laws Kan. 1917, c. 226, § 27.

The phrase "arising out of and in the course of employment" is borrowed from the English Workmen's Compensation Act. That country early recognized the injustice of placing upon the employé all the burdens of industrial accidents, and sought to get away from the common-law rules of negligence as a basis of recovery. Underlying these acts, now adopted by numerous states, is a more humanitarian aspect toward men who work in great industries, and there has been a gradual growth and development of the law in this country along that line. These enactments are based on principles of natural justice, and are to provide for limited recoveries by workingmen in hazardous industries, even though there may be no negligence on the part of the employer, and though there may be negligence on the part of the employé. They are of benefit both to employer and employé, in that it relieves them from the great expense and uncertainty of litigation. Where machinery is destroyed or injured in industry, it is a part of the burden of industry to supply or repair such machinery. Why should the same theory not apply as far as practicable, where human machinery is injured in carrying on the work? There is economic loss in both cases. The burden is one of industry, and should not all be carried by the employé. The work of the hazardous industry cannot be successful, except by the effort of both employer and employé. If the employé suffer an industrial accident and is crippled thereby, there is no justice in turning him out without compensation, often leaving to him only the future of a corner beggar, because forsooth there may have been some little negligence on his part contributing to the injury, or inability to prove negligence on the part of the employer resulting in his injury.

The Supreme Court of the United States in New York Central Railroad Co. v. White, 243 U. S. 188, 197, 37 S. Ct. 247, 250 (61 L. Ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629), has so well expressed the theory of this legislation that we quote from it: "In support of the legislation, it is said that the whole common-law doctrine of employer's liability for negligence, with its defenses of contributory negligence, fellow servant's negligence, and assumption of risk, is based upon fictions, and is inapplicable to modern conditions of employment; that in the highly organized and hazardous industries of the present day the causes of accident are often so obscure and complex that in a material proportion of cases it is impossible by any method correctly to ascertain the facts necessary to form an accurate judgment, and in a still larger proportion the expense and delay required for such ascertainment amount in effect to a defeat of justice; that under the present system the injured workman is left to bear the greater part of industrial accident loss, which because of his limited income he is unable to sustain, so that he and those dependent upon him are overcome by poverty, and frequently become a burden upon public or private charity; and that litigation is unduly costly and tedious, encouraging corrupt practices, and arousing antagonisms between employers and employés."

[1] The Kansas act is similar to the acts of the various states. It is not an insurance statute, but has its limitations as to liability. This case arising under the Kansas statute, we would be bound by a construction given to the phrase in question by the Kansas court of highest authority. The decisions of the Supreme Court of Kansas bearing thereon we refer to hereinafter. That the Kansas courts are inclined to a liberal construction of the act to carry out its underlying purpose, we may say parenthetically, is evidenced by certain words of the opinion of that court in Messick v. McEntire, 97 Kan. 813, 816, 156 P. 740, 741, with reference to a case where they decided contributory negligence of claimant was no defense, viz.: "Nothing save his deliberate intention to cause the injury, his willful failure to use guards or protection provided for him, his deliberate breach of some statutory regulation, or his intoxication can deprive him of his statutory right to compensation for an injury."

In instructing a verdict in this case the learned District Court drew a distinction between the law applicable to workmen of mature years and boys, saying: "And, if put on as strong ground as you are contending for, any one who employs boys the age of this boy, or people of the age and intelligence of the party who was working with him, knows they are going to be playful and reckless, and so on, know it when they employ them."

[2] The writer of this opinion believes the

distinction drawn by the District Court is sound, and that, if an employer places boys as coworkers with others in hazardous employment, he is charged under these Workmen's Compensation Acts with what may happen from the curiosity, zeal, vigor, and boyishness of said boys; that such is a risk reasonably incident to the employment, and if injury result to an employé therefrom during the progress of the work in which he is employed, through the curiosity or pranks such as boys of immature age are wont to indulge in, and which the employer must be held to know of when he employs them, the injury is one "arising out of the employment." The difficulty as to that theory in this case is that there is no evidence in this record that Connell or his coworker, Mergen, were boys. Connell, the record shows, was 21 years of age and over. We find nothing in the record to show the age of Mergen. Certainly a person over 21 years of age can scarcely be placed in the category of boys.

The Wisconsin Industrial Commission allowed a claim in the case of a 14 year old boy who was returning to work after lunch, who went aside from a direct route, and out of curiosity placed his hand under a machine hood, and lost his forearm by the action of the knives. The Wisconsin Commission said that the natural curiosity of a boy of 14 years must be taken into consideration, that a common-sense construction of the law should be given, and that the responsibility for such accident should be placed on the employers who put such children in places of danger, rather than that the children should bear the entire loss themselves.

In Hulley v. Moosbrugger, 87 N. J. Law, 103, 93 A. 79, it appeared that young men and boys were employed, and the court said: "It is but natural to expect them to deport themselves as young men and boys, replete with the activities of life and health. For workmen of that age, or even of maturer years, to indulge in a moment's diversion from work, to joke with or play a prank upon a fellow workman, is a matter of common knowledge to every one who employs labor. At any rate, it cannot be said that the attack made upon the decedent was so disconnected from the decedent's employment as to take it out of the class of risks reasonably incident to the employment of labor." This case, it is true, was reversed by the Court of Errors and Appeals of New Jersey, 88 N. J. Law, 161, 95 A. 1007, L. R. A. 1916C, 1203, the court holding that an employer was not liable to make compensation for injury to an employé which was the result of horse-

play or skylarking, so called, and that such accident did not arise out of the employment. There is much of common sense, however, in the language of the court in the opinion in 87 N. J. Law, 103, 93 A. 79.

28 Ruling Case Law, § 98, pp. 810, 811, says: "It has been noted that the intention of the statute may be said to be to impose in a general fashion a duty of care on the employer, or to charge him with knowledge that injury may result to his employees unless active preventive measures be taken, and there can be no doubt but what this activity extends in a measure to the prevention of 'skylarking' or 'horseplay,' especially where the appliances of the business, such as compressed air hose, may fall into the hands of youthful or irresponsible fellow servants." However, as our decision is not based on this ground, it is useless to pursue this very interesting subject.

Workmen's Compensation Acts have been productive of a multiplicity of decisions in the British courts and in the various courts of the United States, embracing the construction of the term in question. There has been much refinement of reasoning and confusion of the doctrines of negligence in these decisions, where it properly has no place, until in trying to evolve any rule as a safe guide to determine when an accident is one "arising out of the employment" one is lost in a labyrinth of judicial utterance. We refer to a few only of the many cases in this country where the term "arising out of employment" has been considered.

One of the leading cases, perhaps more often referred to than any other, is In re McNicol, 215 Mass. 497, 102 N. E. 697, L. R. A. 1916A, 306, where the court referring to the injury said: "It arises 'out of' the employment, when there is apparent to the rational mind upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. The causative danger must be peculiar to the work and not common to the neighbor-

hood. It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence."

In Verschleiser v. Joseph Stern Son, Inc., et al., 229 N. Y. 192, 197, 128 N. E. 126, 128, where an abattoir worker, resenting a sudden assault by a coemployé, who threw a piece of flesh, used the flesh in striking another employé, believed to be the assailant, who in turn kicked claimant, it was held that it was an accident arising out of the employment. The court said: "The Workmen's Compensation Law (Consol. Laws, c. 67) should be construed broadly. Compensation under it does not depend on any fault of the master or any negligence of the servant. The law was enacted to do away with the defenses which had governed the law of master and servant. The question in each case arising under the Workmen's Compensation Law is: 'Was the injury received while engaged in the master's business?' If the servant had left his employment and was willfully pursuing designs of his own, he would not be entitled to compensation. The man who initiates an assault is doing a willful thing, but this cannot be said of the man who, surprised by physical assault or insult, reacts and in self-protection strikes another. His act is as involuntary as that of closing the eye to avoid dust, the same action and reaction which the law recognizes in its definition of manslaughter." The court further called attention to the fact that the injury was the result of provocation engendered between employés in the course of their employment on the premises of their employer while engaged in their daily work.

In Heitz v. Ruppert, 218 N. Y. 148, 112 N. E. 750, L. R. A. 1917A, 344, a driver brought his horses into the employer's stable, where a fellow workman assisted him in unharnessing them; it being a part of claimant's employment to take care of the horses. He protested against a fellow workman's using too much water on the horses and some controversy arose. The coemployé then turned the hose on him. Later claimant told him not to do that again, whereat the fellow workman slapped him on the shoulder, and as claimant turned around his finger struck claimant's eye, causing injuries. The court held that the injury was accidental and arose out of the course of employment.

In Markell, Respondent, v. Daniel Green

5 F.(2d)—26

Felt Shoe Co. et al., 221 N. Y. 493, 116 N. E. 1060, on appeal from Appellate Division of the Supreme Court in the Third Judicial Department (175 App. Div. 958, 161 N. Y. S. 1134), claimant received injuries resulting in the loss of an eye through the act of an employé who had been repairing machines in defendant's plant, and he approached claimant in a dark room, placed his arms about his neck, and drew his head forward onto a lead pencil in his pocket in such manner that the lead penetrated the eyeball. It was claimed that the act causing the injury was in effect skylarking or horseplay. The court held it was within the scope of employment.

In Bryant et al. v. Fissell, 84 N. J. Law, 72, 77, 86 A. 458, 461, the court said: "We conclude, therefore, that an accident arises 'out of' the employment when it is something the risk of which might have been contemplated by a reasonable person, when entering the employment, as incidental to it. * * * A risk is incidental to the employment when it belongs to or is connected with what a workman has to do in fulfilling his contract of service."

In State ex rel. Anseth v. District Court of Koochiching County et al., 134 Minn. 16, 158 N. W. 713, L. R. A. 1916F, 957, a bartender in defendant's saloon in the city of International Falls was struck in the eye by a drinking glass thrown by a drunken patron of the saloon. There was no personal altercation, and the drunken man did not know what he was doing. It was held that the accident was one arising out of plaintiff's employment as bartender in the saloon.

In Griffith v. Cole Bros. et al., 183 Iowa, 415, 427, 165 N. W. 577, 581 (L. R. A. 1918F, 923) the court said: "The words 'out of' involve the idea that the accident is in some sense due to the employment." The words "out of," as used in the acts, refer to the origin or cause of the accident.

The extent to which the doctrine has been carried is illustrated by the interesting case of Foley v. Home Rubber Co., 89 N. J. Law, 474, 99 A. 624. Foley was in the employ of the Home Rubber Company as a special traveling salesman. It was necessary for him to visit the company's London office, and he engaged passage on the steamship Lusitania and went down with it. It was held that this was an accident arising in the course of and out of his employment. See, also, Walther v. American Paper Co. (N. J. Sup.) 98 A. 264; Feda v. Cudahy Packing Co., 102 Neb. 110, 166 N. W. 190; Stertz et al. v. Industrial Ins. Commission of Washington, 91 Wash. 588, 158 P. 256, Ann. Cas. 1918B,

354; Western Indemnity Co. v. Pillsbury et al., 170 Cal. 686, 151 P. 398; Federal Rubber Mfg. Co. v. Havolic et al., 162 Wis. 341, 156 N. W. 143, L. R. A. 1916D, 968; Pierce v. Boyer-Van Kuran Lumber & Coal Co., 99 Neb. 321, 156 N. W. 509, L. R. A. 1916D, 970; Pace v. Appanoose Co., 184 Iowa, 498, 168 N. W. 916; Waters et al. v. William J. Taylor Co. et al., 218 N. Y. 248, 112 N. E. 727, L. R. A. 1917A, 347. If further investigation is desired, see L. R. A. 1918E, 498, where there are several pages of citations, and L. R. A. 1916A, where, commencing at page 23 there are found some 249 pages of citations on the various questions arising under Workmen's Compensation Acts, including the construction given by various courts to the term in question here.

It is strenuously urged on the part of the plaintiffs in error that at the time of this accident Connell and his coworker were engaged in sportive acts, which have been characterized by the courts as "horseplay," and that consequently the injury was not one "arising out of employment." Boyd on Workmen's Compensation, § 476, states the rule to be that "injuries the result of a spirit of playfulness on the part of the injured servant or his fellows are generally held not received in the course of employment." See Bradbury's Workmen's Compensation Law, p. 100.

Stuart v. Kansas City, 102 Kan. 307, 310, 171 P. 913, 914, quotes with approval from Workmen's Compensation Acts, a Corpus Juris treatise by Donald J. Kiser, at page 79, as follows: "An employee is not entitled to compensation for an injury which was the result of sportive acts of coemployés, or horseplay or skylarking, whether it is instigated by the employé, or whether the employé takes no part in it. If an employé is assaulted by a fellow workman, whether in anger or in play, an injury so sustained does not arise 'out of the employment,' and the employé is not entitled to compensation therefor, unless in a case where the employer knows that the habits of the guilty servant are such that it is unsafe for him to work with other employés."

In White v. Stockyards Co., 104 Kan. 90, 177 P. 522, the same doctrine is held, that ordinarily a master is not liable under the Compensation Act for injuries to workmen which have been caused through the mischiefs, pranks, and jokes of his coemployés, unless the master has knowingly permitted such pranks to continue. Same doctrine, Thomas v. Manufacturing Co., 104 Kan. 432, 437, 179 P. 372, 375 (6 A. L. R. 1145) although

this language in that case is significant: "The plaintiff's participation in the use of the truck would not seem necessarily to bar her recovery; her conduct being of a kind to be expected in girls of her age, and the question of her want of care not being material, the action not being founded on her employer's negligence."

In Romerez v. Swift & Co., 106 Kan. 844, 847, 189 P. 923, 924, deceased turned aside from his work to engage in an altercation with a Mexican and was killed. The court says: "The fact remains that he stepped side from his work and left his task to settle this matter of personal spleen. It cannot be held that in so doing he was in the line of his employment, or that the regrettable result arose out of such employment." And in Peavy v. Contracting Co., 112 Kan. 637, 211 P. 1113, 29 A. L. R. 435, it was held that an employé could not recover of his employer under the Workmen's Compensation Act for an injury inflicted by the foreman in an assault upon the employé, unless the employer had reason to anticipate that injury would result if the two continued to work together.

Stark v. Wilson, Receiver, 114 Kan. 459, 462, 219 P. 507, 508, was a case of where a street car conductor was killed by a passenger, and the court said: "The accident must result from a risk naturally and reasonably incident to the employment. The risk must be within rational comprehension as an incident of the employment, and must be one to which the workman would not be equally exposed outside of the employment. It is not enough for the dependents to say the conductor would not have been killed if he had not been at his place on his car at the time he was stabbed. They must say he was killed because he was a street car conductor on duty, and so was overtaken by a hazard to which performance of his duty exposed him. In applying the tests, the decision of each case will necessarily depend on its own peculiar facts, and in this instance the precedents are not particularly helpful."

These cases fairly show the construction put upon the act by the Kansas courts, viz. that where employés turn aside from their work and engage in sportive acts, commonly referred to as "horseplay," and the accident is the result of injury received thereby, there cannot be recovery under the Workmen's Compensation Act (barring question of immature boys heretofore referred to, and which we pretermit). That the courts are not unanimous on this question is shown by the following authorities:

In Leonbruno v. Champlain Silk Mills,

229 N. Y. 470, 473, 128 N. E. 711, 712 (13 A. L. R. 522), an employé, while devoting his time to work, was struck in the eye by an apple thrown by a fellow servant engaged in horseplay. It was held the injury was one "arising out of and in the course of his employment." The court said: "The risks of injury incurred in the crowded contacts of the factory through the acts of fellow workmen are not measured by the tendency of such acts to serve the master's business. Many things that have no such tendency are done by workmen every day. The test of liability under the statute is not the master's dereliction, whether his own or that of his representatives acting within the scope of their authority. The test of liability is the relation of the service to the injury, of the employment to the risk."

In Stark v. State Industrial Acc. Commission, 103 Or. 80, 100, 204 P. 151, 157, the court said: "It might be remarked parenthetically that it is not to be supposed that a crew of men could be obtained, unless some of them during working hours would play practical jokes on their fellow workmen, especially if such men were red-blooded Americans." See, also, Newport Hydrocarbon Co. v. Industrial Commission, 167 Wis. 630, 167 N. W. 749.

[3] However the general rule of the authorities, and with which the Kansas decisions are in line, is well stated in Annotations to Workmen's Compensation Acts, L. R. A. 1918E, 504, as follows: "The general rule, recognized by practically all of the courts, both under the English act and under the various American statutes, is that injuries caused by some sportive act of fellow workmen, done independently of and disconnected from the performance of any duty of the employment, does not arise out of the employment within the meaning of the compensation statutes, and, consequently, no compensation will be allowed for such injuries." This doctrine is supported by a great majority of the cases. Plaintiff in error in its brief adopts it as the correct rule; we think it is, and measure the case by it.

The line of demarcation between sportive acts of employés done independently of and disconnected from the performance of duty and those in a manner connected with the performance of duty is difficult at times to distinguish, owing to the interweaving of the facts. Was the injury to defendant in error here the result of sportive acts, independent of and disassociated from the performance of any duty of the employment? This requires a close and careful analysis of the testimony. We set out some of the testimony bearing on this question.

From the testimony of defendant in error:

"Q. In what capacity were you working? A. I was cutting boxes.

"Q. You were cutting boxes. What do you mean by cutting boxes? A. I was working on a corner cutter.

"Q. What does that do? A. That cuts boxes, in order to fold up.

"Q. By whom were you designated to that particular post? Who put you at that work? A. The Kansas City Fibre Box Company.

"Q. Do you know the name of the foreman? A. Mr. Jack; I don't know his surname.

"Q. How long had you been engaged in that work? A. I had been engaged at that work for six or eight months.

"Q. On this particular day, what were you doing when this accident happened? A. I was working on my regular duties, cutting boxes, the same as ever.

"Q. And what happened? A. And I was working right along, and I seen my—the fellow that was working on the machine with me had my cap on a stick, holding it up on a stick, and he was shoving in to me—

"Q. Shoving in what to you? A. Shoving in boxes to me.

"Q. Where were you standing with reference to the machine? A. I was standing to left-hand side.

"Q. That the machine you were engaged at all the time? A. No; I worked on several machines.

"Q. That particular day was that machine? A. That particular day was that machine; yes.

"Q. This man was shoving in to you, and what happened? A. He was holding my cap up on a stick, and I asked him for my cap, or said something to him—anyhow, I meant for him to give me my cap. I forget just what I said, and he kept it, holding it up on a stick like he was going to throw it into the scrap pile; that is what I thought, though I don't know that he was going to throw it into the scrap pile; so I pulled a little skull cap off my head, he had put on there some time during the day his own self, and put it on the machine here, like as if I was going to cut it—put it on the table that we were working on; so he just reached over with his left hand and shoved that box in and cut the cap—

"Q. Speak louder. A. He just reached over and shoved that box in, and cut the skull cap, I suppose, that was on the box,

you see, and then he was going to cut mine, and I just stepped over between him and the machine, to the right, and he [catched] me here, and clinched me by the overalls and bib and shirt, and shoved me, and so I was almost in a sitting position when he give me another little quiet shove, and I [throwed] my hand back to catch, in order to keep my head or shoulders from going into the machine, and I got my hand cut off, and I seen my hand cut off, and felt it, too, but I seen my fingers cut; so I just asked him to let me go, or something I says to him, and I just held my hand up like this, and I says, 'Let me go,' and showed him my hand; so he let me loose, and that was all there was to it."

From a statement made by defendant in error after he was hurt, which was used in cross-examination, the following appears:

"Q. I was flipping or turning fiber board at corner cutter machine? A. Yes.

"Q. Nick, a Greek, operated machine, and I was helper; but I traded places [with] Nick, and fed machine part of the time. A. I understand.

"Q. I was experienced on this machine. Close to quitting time— A. Wait a minute, please.

"Q. I was experienced on this machine? A. Yes, sir.

"Q. Close to quitting time; I had been wearing Nick's cap? A. Yes, sir.

"Q. He hadn't been wearing it for a few days? A. Yes, sir.

"Q. Nick was shoving in, and I was flipping or turning? A. Yes, sir.

"Q. Nick took my street cap, which was on springs in front of machine, and made believe he was going to do something with it, throw it away or something? A. Wait a minute, please.

"Q. Nick took my street cap, which was on springs in front of machine, and made believe he was going to do something with it, throw it away or something? A. Yes, sir.

"Q. I put his cap on the table on board, and Nick shoved it in? A. Yes, sir.

"Q. And cut his own cap? A. Yes, sir.

"Q. Then he made a move as if he intended to put my cap under knives? A. Yes, sir.

"Q. And I jumped up on the table of the machine in a sitting position— A. Yes, sir.

"Q. To keep Nick from putting my cap in under knives? A. Yes, sir.

"Q. And he took hold of me and shoved me? A. Yes, sir.  *  *  *

"Q. Nick had not played around machines? A. Yes, sir.

"Q. We might have joked each other or tapped each other away from machines— A. Yes.

"Q. I don't think foreman saw us scuffling? A. Wait a minute.

"Q. I don't think foreman saw us scuffling?  *  *  *

"Q. Anyway, you had been wearing Nick's cap, hadn't you? A. Yes.

"Q. And you put it in the machine and cut the corner off it? A. No, sir.

"Q. Well, the corner was cut off wasn't it? A. I don't know; he shoved it towards the machine to be cut.

"Q. Well, you had a cap, too? A. Yes.

"Q. And he took hold of your cap, did he? A. Yes.

"Q. And you got into a scuffle about the caps? A. Yes.

"Q. And he had ahold of your leg, didn't he? A. No, sir."

His coworker, Mergen, testifies to substantially the same thing, as follows:

"Q. Well, what about the caps? A. Well, I had a little white cap that hung on the screen all the time; I wore it part of the time, and he wore it part of the time.

"Q. That was your cap that he wore part of the time, and you wore part of the time? A. Yes, sometimes.

"Q. What were you doing with the cap? A. I have fiber boards shoved under the machine to cut the corners, and he threw the cap on the board to cut the corner off.

"Q. And what did you do? A. I just pulled it out and reached and got his cap; I done just like I was going to throw it—

"Q. You took his cap? A. Yes.

"Q. And pretended you were going to cut it, is that it? A. Yes.

"Q. What happened? A. Well, he blundered to get hold some way or other, and his hand slipped under this.

"Q. Did you have hold of him? A. Playfully.

"Q. Playfully. But were you wrestling and scuffling? A. Yes; wrestling and scuffling."

On cross-examination Mergen testified that while the cap incident was going on the machinery was running. It appears that at the time the cap was cut he shoved a board, in the due process of his work, under the knives, and the cap went with it. He also testified that defendant in error jumped on the table, that he was stooping down to get hold of his leg, and that defendant in error became overbalanced in some way, and his hand went in the knives.

[4] Does the testimony, with all its fair

and natural inferences, indicate that defendant in error's injuries were received "independently of and disconnected from the performance of any duty of the employment"? It must be borne in mind that at the very time of this injury defendant in error was actually engaged in the performance of a duty of his employment. He was operating a dangerous piece of machinery with his coworker, Mergen, the Greek. His attention to his work was attempted to be diverted by the act of Mergen holding his cap on a stick. His duty to his employer was to keep on working, and to stop the interference with his work by Mergen. This he attempted to do. He pulled a skull cap of Mergen's off his head and put it on the machine, or a table in front of it, and Mergen shoved the box in and cut the cap. The shoving of the box was a part of Mergen's work. Connell, perhaps, did not choose the best way to stop Mergen's interference with his work. It may have been crude. He reciprocated to some extent the play as to the caps started by Mergen. If he ceased work at all, it was but momentary. There was no turning aside from the machine and from the work, and engaging in a fight, a scuffle, or horseplay, as in the case of Romerez v. Swift & Co., 106 Kan. 844, 189 P. 923, hereinbefore referred to, and in the hose cases, Tarpper v. Weston-Mott Co. et al., 200 Mich. 275, 166 N. W. 857, L. R. A. 1918E, 507, Federal Rubber Mfg. Co. v. Havolic et al., 162 Wis. 341, 156 N. W. 143, L. R. A. 1916D, 968, and also as in De Filippis v. Falkenberg et al., 170 App. Div. 153, 155 N. Y. S. 761. It is as reasonable to suppose that he was trying to stop the interference with his work as that he was engaging in any personal horseplay with his coworker. His injury certainly was not due entirely to the scuffling or playing. It was due to a combination of the playful acts, if they can be so designated, and the employment in connection with the dangerous machine. The acts were not entirely independent of or disassociated from the performance of his duty. His coworker was evidently trying to delay him and bother him. He was trying to stop this interference. The sportive acts of the workman, at least as to defendant in error, were not independent of their work. If Mergen had attempted to stop his work at the machine he certainly would have been carrying out his duty to his employer in trying to prevent him from so doing. Here Mergen kept on with his work during the attempt to bother and annoy Connell. In nearly all of the cases where the sportive acts are held to take the case out of the rule of injury arising out of the employment, there was a turning away from work and engaging in a personal encounter or horseplay, so called, not connected in any way with the performance of any duty to the employer, but as the result of mere personal desire or whim. Here Connell in part, at least, was serving his employer by trying to stop interference with his work, and Mergen combined sportive acts with his work.

While in the Stuart v. Kansas City Case, 102 Kan. 307, 171 P. 913, heretofore referred to, the party injured was engaged in his work, that question does not seem to have been considered by the court, but the decision was based on the fact that the custom of pranks and jokes on the part of the injured party's fellow workman was known to his immediate superiors. Injury in that case was not the result of any effort by Stuart to prevent the party interfering with his work, and the company employé causing the injury was doing something entirely apart from his duties. The rule, stated in that case from Corpus Juris with approval, refers to injury sustained as the result of sportive acts. Here the injury sustained was not the result of sportive acts entirely disconnected from the employment. While the question is a close one, a careful analysis of the actual occurrence, and consideration of all the circumstances, shows, we think, that the alleged sportive acts of defendant in error and his coworker, were not "done independently and disconnected from the performance of any duty of the employment." It would not seem that the broad purpose of the Workmen's Compensation Acts should be defeated by a circumstance somewhat trivial such as presented here, where the parties did not turn from their work and engage in the alleged horseplay, but where both were going ahead with their work, and one of them at least resorted to the sportive act as a means of preventing further annoyance or interference with his labor.

The judgment is therefore affirmed.

STONE, Circuit Judge (dissenting). This is an action for personal injuries under the Workmen's Compensation Act of the state of Kansas. From a judgment on a directed verdict, defendant sues this writ of error. The accident was caused by Connell throwing his hand in the way of moving knives on a box-cutting machine during a playful scuffle which arose between him and his fellow workman while they were working at the machine. The play arose over the caps of

the two workmen and the threatened move of the other workman to put Connell's cap where it would be cut by the knives. But one question is presented here. That question is whether the master is liable, under the Kansas Workmen's Compensation Act, for injuries resulting from playful pranks between workmen of age where the employer has not notice or knowledge of such habits or play and does not permit it. Of course, the answer to this question has to be sought in the proper construction to be given that act. The construction of a state statute is a matter of local law; therefore, the decisions of the Supreme Court of Kansas must be examined to ascertain whether that court has determined the question before us. If it has, that decision is binding here.

There are several cases, not involving injuries from pranks or play, which state generally the view of the Supreme Court of Kansas as to how the cause or occasion of the injury must be connected with the employment to come within the act. The most recent statement of this general character is contained in Stark v. Wilson, Receiver, 114 Kan. 459, 219 P. 507, which was a suit, under the act, for death of a street car conductor who had been stabbed by a passenger. The court, at page 462 (219 P. 508), said:

"The accident must result from a risk naturally and reasonably incident to the employment. The risk must be within rational comprehension as an incident of the employment, and must be one to which the workman would not be equally exposed outside of the employment. It is not enough for the dependents to say the conductor would not have been killed if he had not been at his place on his car at the time he was stabbed. They must say he was killed because he was a street car conductor on duty, and so was overtaken by a hazard to which performance of his duty exposed him."

Also, see Peavy v. Contracting Co., 112 Kan. 637, 639, 211 P. 1113, 29 A. L. R. 435.

Fortunately, we are not left to apply such general statements of the rule to cases, like the present, where the injury is the direct result of playfulness or pranks. The Kansas Supreme Court has considered liability from such causes in the cases of Thomas v. Manufacturing Co., 104 Kan. 432, 179 P. 372, 6 A. L. R. 1145, White v. Stockyards Co., 104 Kan. 90, 177 P. 522, and Stuart v. Kansas City, Kansas, 102 Kan. 307, 171 P. 913, and 102 Kan. 563, 171 P. 913. Stuart v. Kansas City, Kansas, 102 Kan. 307, 171 P. 913 (on rehearing 102 Kan. 563, 171 P. 913), was an eye injury to plaintiff

from mortar thrown in sport by a fellow workman *during the course of the work.* The instruction of the trial court permitted recovery irrespective of the notice or knowledge of defendant as to the habit of the workman, who threw the mortar, to engage in dangerous play. Because of this error in the instruction, the case was reversed, the Supreme Court, at page 310 (171 P. 914), saying:

"A clear and concise statement of the law governing compensation for injuries to employees caused by play is found in Workmen's Compensation Acts, a Corpus Juris treatise, by Donald J. Kiser (page 79), and is as follows: 'An employee is not entitled to compensation for an injury which was the result of sportive acts of coemployees, or horseplay or skylarking, whether it is instigated by the employee, or whether the employee takes no part in it. If an employee is assaulted by a fellow workman, whether in anger or in play, an injury so sustained does not arise 'out of the employment,' and the employee is not entitled to compensation therefor, unless in a case where the employer knows that the habits of the guilty servant are such that it is unsafe for him to work with other employees.' The rule there declared is supported by Western Indemnity Co. v. Pillsbury, 170 Cal. 686; McNicol's Case, 215 Mass. 497; Scott v. Payne Bros., 85 N. J. Law, 446; In re Loper (Ind. App.) 116 N. E. 324; Clayton v. Hardwich Colliery Co., 85 L. J. K. B. 292. Under these authorities the rule is that where a workman, known by his master to be in the habit of indulging in dangerous play with his fellow workmen, is retained in the master's employ, the danger of injury from such play becomes an incident of the employment of the other workmen, and injury to any of the other workmen, while performing his regular work, caused by such play, comes within the provisions of the Workmen's Compensation Act."

In a short opinion denying a rehearing, the court accentuated its position (102 Kan. 563, 171 P. 913), by saying:

"The plaintiff has filed an application for a rehearing, and, in that application, asks that, if a rehearing is denied and the judgment stands reversed, the new trial be directed on the proposition on which the judgment was reversed. The judgment was reversed on the ground that an instruction was erroneous because it did not submit to the jury the question of the defendant's knowledge of the dangerously playful habits of William Deeds, a fellow workman with

whom the plaintiff was working at the time of his injury.

"The judgment of reversal is adhered to, and a new trial is granted on the following questions: (1) Was the plaintiff injured by William Deeds, accidentally or in sport? (2) If the plaintiff was injured by William Deeds in sport, was William Deeds in the habit of indulging in dangerous play with his fellow workmen? (3) If William Deeds was in the habit of indulging in dangerous play with his fellow workmen, did the defendant have notice or knowledge of that habit?"

To the same effect is the case of White v. Stockyards Co., 104 Kan. 90, 177 P. 522. Also, see statement in Monson v. Battelle, 102 Kan. 208, at page 213, 170 P. 801. Both the Stuart and the White Cases were instances of injuries to adults from the pranks of other adults.

Admitting that the above rule would govern if the injury was occasioned to and by an adult, defendant in error contends that a different application of the rule must be made as to children or youths. His position is that although there would have to be proof of notice and knowledge in the employer respecting the habit of dangerous play if the injury concerned adults alone; yet, as to children or youths, this notice and knowledge must be conclusively presumed to exist because the playfulness and recklessness of young people is universally known. His counsel well states this position as follows:

"The position taken by plaintiffs in error is, that the rule applies only in cases where the sportive characteristics of the employees are known to the employer or where 'horse play' has become habitual. Granting that to be a true statement of the rule, the District Judge gave it proper consideration because the sportive characteristics of boys must always be known to the employer. Of men of mature years—no. That where the employees are all grown-up men of the world, to render the employer liable for their pranks it must be shown that 'horse play' is or has been common. But the employer cannot close his eyes and say he does not know, and has not seen what everybody else does know and has seen—that 'boys will be boys,' and boys will play, and until all the fun, all the mirth, and the joy, and the happiness has been ground out of their lives by constant drudgery in the mills, they will continue to do so."

The view of the able trial court is along the same line and is strongly and clearly summarized by counsel for defendant in error as follows:

"In directing a verdict in this case, he announced the same rule—'that the defendant in error would not have been injured by the scuffle but for his presence in the factory in association with other workmen.' He announced the rule here that the defendant in error was brought by his work within the conditions of the zone of special danger. He announced the rule here that whatever men and boys will do when gathered together in such surroundings was one of the perils of the service. He announced the rule here that it was but natural to expect them to deport themselves as young men and boys replete with the activities of life and health. He announced the rule here that for workmen of that age or even of maturer years to indulge in a moment's diversion from work to joke with or play a prank on a fellow workman is a matter of common knowledge to every one who employs labor. He announced the rule that the claimant was injured not merely while he was in the factory, but because he was in a factory, in touch with associations and conditions inseparable from factory life, and the risk of such associations and conditions were risks of the employment."

The plaintiff here was a young man 21 years old at the time of accident. Without undertaking to draw the age line where the rule of notice and knowledge should be applied, if at all, I examine the Kansas decisions to ascertain if there is this difference as is contended.

Again, fortunately, the Kansas Supreme Court has decided as to this very distinction in the case of Thomas v. Manufacturing Co., 104 Kan. 432, 179 P. 372, 6 A. L. R. 1145. The plaintiff there was a girl "about seventeen years of age" and was injured during the noon hour by falling from a small truck upon which she and other girls were riding for amusement. There was conflicting evidence as to whether the master had knowledge of and had consented to such use of the truck by these girls. As to that matter the court, at page 434 (179 P. 373), said: "The conflict of evidence as to the attitude of the company toward the girls' practice of playing with the trucks must of course be resolved in favor of the plaintiff." After stating that it was necessary to recovery that the injury was "in course of" the employment and "arose out of" it, the court discussed each of those matters. As to the latter, at page 437 (179 P. 374), it said:

"Whether the plaintiff's injury arose out of her employment is a more difficult ques-

tion. Injuries received in play are not usually capable of being so classified. Two illustrative cases are reported, passed upon by a commission and a committee of arbitration, which are in some respects quite similar to that under consideration. Socquet v. Connecticut Mills Co., Conn. W. C. C. C. Digest, 1914–1916, p. 653; Thompson v. W. L. Douglas Shoe Co., 2 Mass. W. C. A. 145. If the present case is to be taken out of the general rule, it must be upon the ground that the habit of the girl employees to play with the trucks during the noon intermission, with the knowledge and express consent of the foreman, and without objection by any one representing the defendant, made such practice one of the conditions under which the business was carried on, upon much the same principle as employers are held liable for the results of horseplay which has grown into a custom. White v. Stockyards Co., 104 Kan. 90, 177 P. 522. Injuries have been held to arise out of the employment whenever they are 'such as the character of the business or the conditions under which it is carried on make likely, and the result either was or should have been in the contemplation of the employer.' Jacquemin et al. v. Turner & Semour Manufacturing Co., 103 A. 115 (Conn.). The plaintiff's participation in the use of the truck would not seem necessarily to bar her recovery, her conduct being of a kind to be expected in girls of her age, and the question of her want of care not being material, the action not being founded on her employer's negligence."

The view of the court is summed up in the concluding paragraph of the opinion as follows: "Inasmuch as the evidence may be regarded as establishing that the play in which the plaintiff was injured had become a settled custom, with the knowledge and indeed the express approval of the foreman in charge of the department, and without objection on the part of any one, the court is of the opinion that her injury may be regarded not only as having occurred in the course of her employment, but as having arisen out of it."

The decision in the Thomas Case must be taken as determining the law to be that the distinction urged by defendant in error does not exist.

There was no evidence of any custom or habit of playing, either by the workman causing the injury or by others There was, of course, no evidence of notice or knowledge in the employer as to playing. Although this scuffling and play arose while the injured man was working, yet he voluntarily participated therein, and it was while playing and as a direct result of such playing that the injury resulted. I am unable, upon the facts, to distinguish this case from the Stuart Case, supra, where the injury occurred while the parties were at their work.

I think the case is governed by the Kansas decisions cited and should be remanded.